# CRIMINAL CASES

## Richmond

### JACKSON v. COMMONWEALTH

#### March 19, 1914.

1. CRIMINAL LAW—*Confessions—Persons in Authority.*—A person who, under the direction and with the approval of the attorney for the Commonwealth, actively engages in the effort to ascertain the perpetrator of a crime and to secure his arrest and conviction, (the accomplishment of which will secure to him a reward) is a person in authority, and a confession to him induced by the hope of the gain of some advantage, or to avoid some evil in reference to the proceeding against the person making such confession is not admissible in evidence against him.

2. CRIMINAL LAW—*Confessions—Burden of Proof.*—The burden of proving that a confession was voluntary rests upon the Commonwealth.

Error to a judgment of the Circuit Court of Sussex county.

*Reversed.*

The opinion states the case.

*Armistead & Burt,* for the plaintiff in error.

*Christopher B. Garnett, Assistant Attorney-General,* for the Commonwealth.

CARDWELL, J., delivered the opinion of the court.

The defendant, Emanuel Jackson, plaintiff in error

here, was indicted for the offense of murder, and on his trial was found guilty, a motion was made for a new trial on the grounds therein stated, which was overruled by the court, and the defendant excepted.

The main ground of error relied on, and which is the controlling question presented, is the ruling of the trial court allowing one W. J. Ellis to testify on behalf of the prosecution to an alleged confession made by the defendant to him, since without this alleged confession the evidence certified in the record is plainly insufficient to sustain the verdict of the jury.

It appears from the evidence that the victim of the homicide, Andrew J. Dunn, who was a farmer, left his home on the afternoon of Saturday, October 12, 1912, between the hours of three and four o'clock for the purpose of hunting in the "low ground" which was about two miles from his home, taking with him his gun; and not having returned at about 7:30 o'clock search was made for him, resulting in finding him dead in the "low ground;" his death having been caused by a gun-shot wound, putting twelve buckshot in his abdomen. There after the defendant as well as his father, Frank Jackson, Sr., was arrested upon the charge of having committed the murder, but no charge was then or thereafter made that the murder was the result of a conspiracy on the part of the defendant and his father, having for its purpose the murder of Dunn, and there is no intimation in the record of the existence of such a conspiracy. Frank Jackson, Sr., has since the trial and conviction of the defendant in this case been tried, convicted, and is now serving a sentence of eighteen years imprisonment for this murder.

When the defendant, Emanuel Jackson, was released on bail, the said W. J. Ellis, by whom he had been employed for about seven years, went on his bail bond for

$500. Before that time Ellis, acting under the authority of the attorney for the Commonwealth, had secured blood-hounds and attempted to track the guilty party, but these efforts proved of no avail. The evidence as well as the admissions of the attorney for the Commonwealth show that Ellis had been actively engaged in trying to ferret out who had murdered Dunn, and had been active in trying to apprehend and arrest such person, and to bring about his conviction, the accomplishment of which result would secure the reward of $300 that had been offered and not withdrawn, "payable to the person or persons bringing about the arrest and conviction of the murderer of Andrew J. Dunn."

After the arrest and commitment of the defendant to jail, as appears from the evidence, including that given by Ellis himself, Ellis was permitted to and often did visit the defendant in the jail carrying him food, tobacco, etc., and on each of these visits he tried to induce the defendant to make a confession of the murder. The evidence given by Ellis as to the confession alleged to have been made to him by the defendant, as certified in the record, is as follows:

That he (Ellis) was working on this case under the direction and with the approval of the attorney for the Commonwealth, but did not hold any public office, and used to go to see the defendant right often, carrying him food and tobacco.

"I talked with him privately most any time. On each of these visits I tried to induce the defendant to make a confession of the murder. I told the defendant that the best thing he could do would be to admit the murder if he did it, to tell the truth, and my motive in telling him this was to induce him to confess. He told me several times there was something he wanted to tell me if I would never tell, but he never told me what it was. While the

defendant was in jail he wrote me several letters which I have here.''

That in these letters he names several different people who, he says, did the killing. That the people he named were, at different times before the defendant was put in jail, talked about as the ones who might have committed the murder.

That one of these letters, dated February 20, 1912, was sent to his (Ellis's) home by Wm. Hale, the jailer, and in it the defendant asked him to come to the jail to see him (the defendant) that morning. That he was in Richmond that day and did not get back until late that night and did not go to the jail until Sunday morning. That he carried the defendant something to eat and some tobacco, and that he found that there had been an attempt to break jail on Thursday night before by some of the prisoners. That he asked the defendant why he tried to break out of jail, and he (defendant) denied that he did try to break out of jail, but that he tried to keep other persons in jail from breaking jail and trying to get out. That he talked to him again about killing decedent and said to him, ''Tell the truth if you don't live a minute.''

That on this visit to the jail the following conversation took place between the defendant and himself (Ellis). That he said to him: ''What in the name of the Lord did you all want to break out of jail for? Don't you know if you had have gotten me here you might have brained me and gotten out for a few days but would have been soon run down and shot or lynched? It seems to me that you have enough on your hands now, with Andrew Dunn's body on your hands with twelve buck shot in it to go before your Maker.'' He began to cry and said, ''Boss, what is the best for me to do?'' I said, ''Tell the truth if you don't live a minute.'' He said, ''Boss, I'm guilty and I want Judge West to know it before court

day." That he asked him to see Judge West and let him know it, which he did. That he said, "You did it then, didn't you?" And that he said, "Yes, sir, I done it." That I said, "What in the name of God forced you to do it. Emanuel, did your daddy make you do it?". That he swallowed a time or two, raised his head and said nothing more. That he (defendant) asked him, "Didn't John Mason plead guilty?" and that I told him "Yes." That he said, "I see they haven't sent him to the chair." And I said, "No." That he promised defendant that he would go and see Judge West the next morning. That he went to Petersburg last Monday and took David Blake with him. That David preached to the defendant about his soul and the condition that he was in, etc. That he supposed he talked about 25 or 30 minutes. That David asked him to tell him all about this thing. That he would not tell David anything; that he (Ellis) broke in and said that he had seen Judge West and told him what defendant had said and that Judge West told him he "would consider what he had told him and abide according to law." That the defendant said, "Yes, sir, Boss, but I aint going to do that now." That he said, "You want to withdraw that now, do you?" That defendant said, "Yes, sir."

Not only in this alleged confession so wanting in clearness as to what guilt the defendant was confessing, whether guilty of an attempt to break jail or guilty of the murder of Dunn, but upon its face it clearly appears, we think, that if the defendant in fact made the alleged confession and had reference to the charge of murder pending against him, the confession was induced by the hope, inspired by what Ellis had said to him, that he would thereby escape the extreme penalty of the law for this offense. True, Ellis did not hold a public office, but so active was he in the prosecution of the defendant that

the attorney for the Commonwealth at his trial had to admit that he could not carry it on satisfactorily without the presence of Ellis at his side. For what was Ellis to see Judge West, who was to preside at the trial, unless in compliance with a promise he had made to the defendant, that if he would confess, he (Ellis) would see Judge West and thereby secure or try to secure some advantage to the defendant, who was laboring under the fear that he might be sent to the electric chair?

As said in *Thompson's Case,* 20 Gratt. (61 Va.) 750: "A confession of the accused is admissible evidence against him only when it is voluntary; that is, when made without motives of hope or fear of temporal advantage or injury, excited by a person in authority or with the apparent sanction of such a person." In other words, the court there held that the burden of proof that the confession was voluntary devolved upon the Commonwealth.

The rule in Virginia is well established by the decided cases, that persons in authority, (within the rule excluding a confession, unless it appears that it was not obtained from the party by some inducement of a wordly or temporal character in the nature of a threat or promise of benefit held out to him by a person in authority, or with the apparent sanction of such person or persons), are such as are engaged or concerned in the apprehension, prosecution, or the examination of the accused. *Smith's Case,* 10 Gratt. (51 Va.) 724; *Shifflett's Case,* 14 Gratt. (55 Va.) 652; *Vaughan's Case,* 17 Gratt. (58 Va.) 576; *Early's Case,* 86 Va. 928, 11 S. E. 795.

It cannot be doubted that our own cases, as well as the cases decided in other jurisdictions, hold that an alleged confession is inadmissible where it was induced by the hope of the gain of some advantage or to avoid some evil in reference to the proceeding against the declarant.

. In *People* v. *Walcott,* 51 Mich. 614, 17 N. W. 79 (opinion by Cooley, J.) it was held that: "Where three persons were permitted to visit the prisoner separately at night whose mission appeared to have been to obtain confessions by impressing upon the mind of defendant that it would be better for him, or he would get off easier, if he made a confession, these visits carried with them an implication of the officer's consent to their mission and the defendant could not fail to be impressed that their assurances were made with full authority."

The opinion laid no stress upon the fact that the visits to the defendant were at night and made by three different persons on the same mission, but bases its ruling upon the irresistible inference to be drawn from the circumstances proven that the impression made upon the mind of the defendant necessarily was that he would get off easier if he made a confession, and that the assurances given him by these visitors were made with full authority.

In this case the defendant was not only necessarily impressed by what was said to him by Ellis, whom he, by reason of having been in his employ for seven years, called "Boss," that it would be better for him or he would get off easier if he confessed, but according to Ellis's own statement he could not have failed to be impressed that Ellis's assurances were made with full authority of those having the control of the prosecution against him.

It follows that we are of opinion that the ruling of the trial court admitting as evidence against the defendant the confession alleged to have been made by him to the witness, W. J. Ellis, was erroneous.

Other assignments of error relied on for a reversal of the judgment against the defendant present questions not likely to arise on another trial of the case and we

have, therefore, deemed it unnecessary to consider them.

The judgment of the circuit court is reversed and annulled, the verdict of the jury set aside, and the case remanded for a new trial in accordance with the views expressed in this opinion.

*Reversed.*