# Richmond

## WILLIAM BELCHER V. COMMONWEALTH OF VIRGINIA.

March 16, 1933.

Present, All the Justices.

The opinion states the case.

*Paul Johnson, B. A. Davis* and *B. A. Davis, Jr.,* for the plaintiff in error.

*John R. Saunders, Attorney-General,* and *Edwin H. Gib-*

*son* and *Collins Denny, Jr., Assistant Attorneys-General,* for the Commonwealth.

EPES, J., delivered the opinion of the court.

This is a writ of error to a judgment of the Circuit Court of Franklin county sentencing William Belcher to serve five years in the penitentiary for the murder of James Leslie Patterson.

The fundamental question raised upon this writ of error is: Did the court err in admitting an alleged confession of the accused to be introduced in evidence? The relevant facts are these:

For some months prior to December 26, 1931, James Leslie Patterson, an old man, had lived alone in a log cabin which was situated in a lonely place at the foot of Turkeycock Mountain, in Franklin county, Virginia. In this general locality a number of illicit stills had been destroyed by the officers, and on December 22, 1931, they had raided a still located near Patterson's cabin and arrested Noell Barbour (a white man) and Henry Becker (a negro) as the operators of it.

The road leading to Patterson's cabin turns off from the "big road" at or near the home of a negro named Jesse Pinkard, runs by the home of Charlie Haynes, and then to or by Patterson's cabin.

James Leslie Patterson was last seen alive about eleven a. m., December 25, 1931. On the afternoon of the 26th his dead body was found lying across the bed in his cabin with wounds in its left side made by several hundred number six shot. The character of the wounds showed that he had been shot several times. Wads from shells for a twelve gauge shotgun were found in the yard of the cabin, and a pistol bullet had pierced the front door of the cabin, passed about a foot above his bed, and lodged in the wall. But no clue was found about the premises which pointed to the person or persons who had fired these shots.

In their search for the perpetrators òf this crime the officers proceeded upon the theory that he had been killed by persons who suspected him of having reported their still; and, after an investigation lasting approximately thirty days, they arrested four white men, Noell Barbour, William Belcher, Buster Patterson and Leonard Mason, upon the charge of having murdered him.

William Belcher had been raised in this community, but had gone to Roanoke about seven years before this occurrence, and was at that time employed by the Norfolk and Western Railway Company. His father still lived in this neighborhood, and on December 25th Belcher had driven over from Roanoke in his automobile to his father's home to spend the Christmas holidays and go hunting. About eleven o'clock that night he was seen with Noell Barbour at Jess Pinkard's house, where a negro dance was going on. Buster Patterson and several other white people and the negroes, Henry and Lewis Becker, were also there. A little later William Belcher and Noell Barbour were seen driving off in Belcher's blue Chrysler touring car, going in a direction opposite to that of Patterson's cabin. About one a. m. a touring car was seen to turn into the road leading from Jess Pinkard's house to Patterson's cabin and to pass the house of Charlie Haynes; but no witness was able to identify this car or tell who was in it. About two a. m. Charlie Haynes, and another person who was at his house, saw the lights of an automobile which was coming along this road from the direction of Patterson's cabin and going toward Jess Pinkard's house.

Horace Patterson, a son of the deceased, lived about five miles from his father's cabin. He testified that on December 26th William Belcher came by his home and told him that "he come by to let us know that Noell Barbour, Buster Patterson and some hunters had said they had gone by there and found my father dead over there"; but Belcher did not tell him anything about the cause of his father's death.

So far as the record discloses, these were about all the

facts which were known to the officers and the Commonwealth's attorney when the four men above named were arrested. Though they seem to have suspected that the negroes, Henry and Lewis Becker, were also implicated, they evidently had no evidence which they deemed sufficient to warrant their arrest.

William Belcher was arrested and lodged in jail in Rocky Mount on January 25th or 26th. On the same day his brother, Irving S. Belcher, who is a policeman of Roanoke, learned of his arrest and came to Rocky Mount, where he had a conference with Mr. Carter Lee, the Commonwealth's attorney of Franklin county. After this conference he went to see his brother in the jail, and soon thereafter called Mr. Lee into William's cell. There, in the presence of Irving Belcher, William made a statement to Mr. Lee regarding his knowledge of and connection with the killing of James Leslie Patterson. After he had made this statement he was released on $15,000 bail; Buster Patterson and Leonard Mason were released from custody; and Henry and Lewis Becker were charged with the murder of Patterson and committed to jail. In this connection it may be noted that Mr. Lee admitted that he knew at the time that the sureties on Belcher's bail bond were not worth the penalty of the bond.

A few days later Mr. Lee came to Roanoke where he saw Irving Belcher and got him to get his brother William to meet him at the office of a Mr. Johnston, the finger print expert of the city police department. There, in the presence of Mr. L. R. Morris, a lieutenant of the city police force, and Irving Belcher, William Belcher again made his statement to Mr. Lee, who made written memoranda of what he told him. Morris made no memoranda of what was said, and testified from his memory, which he stated was incomplete and not clear on a number of points. According to his testimony William Belcher made the following statement to Mr. Lee:

He (William Belcher) came from Roanoke to Franklin

county on Christmas afternoon and brought with him his gun to go hunting. At Rocky Mount he met up with Noell Barbour, who asked him if he would "carry him down the road somewhere" that night, and he told him he probably would. He saw Barbour that night at a dance and Barbour asked him "was he going to carry him on this trip," and he told him he would. He and Barbour got in his (Belcher's) car and drove off, and soon thereafter they stopped and picked up Henry Becker and Lewis Becker, each of whom had a shotgun with him. He (Belcher) still had his gun in his car. He asked Barbour where he was going and Barbour told him that he was going to James Patterson's house to shoot around in the woods away from the house to scare the old man out of the neighborhood. They drove to Patterson's and got behind a corn crib, and about that time he (Belcher) "heard a shot fired, and he hollered don't shoot that man." When this happened he ran to his car, and after he got in the car he heard two more shots fired back there in the dark. He then told the others that they had better come on and get out of the way, that the dogs were barking and somebody would be down there. They then left and went towards Rocky Mount.

Morris further testified that Belcher said something about his having given the negroes one or two shells, but that he still had all the shells he carried down there; that he did not shoot, and that after the shooting was over he broke his gun and showed the others that he had not shot; and that something was said by Belcher about a still, but that his (Morris's) recollection was not clear as to just what he said about the still.

On February 1, 1932, Noell Barbour, Henry and Lewis Becker were indicted for the murder of James Leslie Patterson, but the record does not show whether they were jointly or severally indicted. On the same day William Belcher was severally indicted for the same offense. On February 13th, Noell Barbour was tried, and William Belcher, who was introduced as a witness for the Common-

wealth, testified against him. The jury found him guilty of murder and fixed his punishment at twenty years in the penitentiary, and he was sentenced accordingly. Henry and Lewis Becker both pleaded guilty and were sentenced by the court to serve terms of twenty years in the penitentiary.

On February 18th, William Belcher was placed upon trial. He pleaded not guilty. In the course of his trial the Commonwealth offered to prove by L. R. Morris the statements which had been made in his presence to the Commonwealth's attorney by William Belcher.

The accused objected to the introduction of this testimony on the ground that he had been induced to make these statements by a promise made to him by the Commonwealth's attorney that, if he would tell what he knew about the killing of the deceased and testify against the others implicated, he would not be prosecuted. The Commonwealth denied that this was true. The evidence relating to the admissibility of the confession, which was heard by the court out of the presence of the jury, was, in effect, as follows:

The Commonwealth introduced Mrs. Cribb, the stenographer who had reported the evidence given by William Belcher on the trial of Noell Barbour, and asked her this question—"State whether or not the question was asked by me of William Belcher at that trial [Noell Barbour's] as follows: 'Has any promise of immunity, or hope of light punishment been made to you by anyone if you would testify in this case?' " After reference to her notes she replied that this question had been asked, and that William Belcher's answer was, "No, sir."

The Commonwealth then introduced Mr. L. R. Morris, by whom the Commonwealth proposed to prove William Belcher's confession. He testified as follows:

### Direct Examination.

"Q. Prior to the time he made that statement [the alleged confession], tell the court whether or not any offer

was made to him as to immunity, or any hope of reward, or light punishment?

"A. Not to my knowledge.

\* \* \* \* \* \* \*

"Q. What was said to him by Mr. Lee with reference to his punishment before he made his confession?

"A. Before he made any confession, or before anything was wrote down, what Mr. Lee wrote down, to the best of my recollection, Mr. Lee told him he wasn't promising him anything, and he afterwards made the statement."

### Cross-Examination.

"Q. Following that [Belcher's statements], didn't Mr. Lee make a statement in your presence to William Belcher, if you will stick to me now, I will see that you come out all right, or words to that effect?

"A. Well, I didn't hear him come right out with that statement, I heard that, but I didn't hear it from him at that time.

"Q. What did you hear?

"A. To the best of my recollection, Mr. Lee asked him, after he got this confession or statement, there was something said about an indictment, and he says, well, do you want me to indict you now or later on, or words to that effect, I wouldn't be positive, because I don't know exactly the words he used, that was all I recall being said at that time.

\* \* \* \* \* \* \*

"Q. From your experience, as a man of judgment and business, and as a police officer, what did you understand the statement Mr. Lee made to Mr. Belcher to mean?

"A. I don't know, I wouldn't want to pass on that, that is just an opinion.

"Q. What was your opinion as to the meaning of that statement?

"A. I never gave it much thought right at that particular time, until a couple of days later.

"Q. What construction do you put on that statement now?

"A. I would certainly be expecting something, I believe, that is my opinion, that is from what Mr. Lee told him.

"Q. If you were William Belcher, you would certainly be expecting something?

"A. I certainly would.

"Q. Now, Mr. Morris, one other question. In this conversation, didn't Mr. Lee ask Mr. Belcher if he wanted him to indict him, and didn't Belcher agree there on that day, he had better indict him, and keep the thing from looking bad, and suspicious, as to the others?

"A. I think he asked him, but I don't recall that William said that, somebody did say it, but I don't recall which one, because I was disinterested in it.

"Q. Wasn't Mr. Irving Belcher present at that time?

"A. Yes, sir.

"Q. And in that conversation, something was said to Mr. Lee that he had better indict him to keep people from getting suspicious?

"A. I am not positive. It seems to me like Mr. Lee says I am going to find out about this, I believe those are the words he used, he says I will be back directly and we broke up, and left about that time, I went out and I think Mr. Lee did too.

"Q. If you had been charged with a crime under similar conditions, you would have been expecting something, from the statements you heard?

"A. From what I have heard since, I expect I would. I don't know what had transpired before that. I couldn't say."

Irving S. Belcher was then introduced as a witness by the accused. He testified, in effect, as follows:

On the day my brother, William Belcher, was locked up I went to Rocky Mount and saw Mr. Carter Lee at his office, and asked him about the case against my brother. Mr. Lee said that he had a strong case against my brother,

my brother-in-law, Buster Patterson, Leonard Mason and Noell Barbour, and that the strongest case was against Noell Barbour, and the second strongest against my brother. He told me my brother was with the crowd, said: "I know that he drove the car, but so far as I could find out he wasn't implicated in the shooting." I asked him a few questions regarding the case, and he said that he had an iron-clad case. I told him if my brother knew anything I believed I could get it out of him. We talked a bit, and I said, as you lined the case out to me, my brother was with them, but you do not think he had anything to do with it, further than that he was driving the car and was in the crowd. If that is so, what's the outcome? He said: "If your brother comes up before me and tells the whole thing he won't be prosecuted," and I asked him to go down and bring my brother up there.

I told my brother that I had talked to Carter Lee. He first said that he was not guilty, that he had nothing to do with it. Later he turned in and told me the whole thing from one end to the other. A part of what he told me was along the line Mr. Lee had told me.

I went out and told Carter Lee to come in there and he (William Belcher) told him the case. Mr. Lee told him, "stick to that on the witness stand and stick with me in this case and you will come out all right."

A few days later Mr. Lee came to Roanoke and asked me to get in touch with my brother which I did. We went in Mr. Johnson's office and Mr. Lee took his pad and wrote his statement down. Lieutenant Morris was present. After Mr. Lee finished writing it down he said to my brother in my presence, "Do you want me to indict you now." My brother said, "I don't know," and asked me. I said, "I expect you had better, don't it will be a confliction in the case and cause embarrassment on your part." He said, "All right."

The day my brother was indicted I asked Mr. Lee about a lawyer and he said it wasn't necessary. I also went to

Paul Johnson (an attorney in Roanoke) and talked to him about the case, and he told me the same thing. I have been over here and talked with Mr. Lee eight or ten times about the case, and that is the impression he left upon me every time. My brother testified in the Noell Barbour case under the assumption that he would not be prosecuted. When Mr. Lee was talking to my brother about testifying in the Noell Barbour case he told him that when he got on the witness stand they were going to ask him whether he had been promised any immunity or light sentence, and to tell them "no."

Mr. Paul Johnson, who was one of the counsel who represented William Belcher at his trial, was then introduced by the accused. He testified to the following effect: He had talked with Irving Belcher with reference to his conversation with Mr. Lee, though he did not recall exactly what Irving Belcher said Mr. Lee told him. But from what he told him, he had been expecting leniency for his client until about two days before the trial when Irving Belcher told him that something had gone wrong—that Mr. Lee had advised him that he had better get local counsel. With reference to a conversation he had with Mr. Lee on the morning of Noell Barbour's trial his testimony was this:

"A. Mr. Lee said that he could not promise my client anything, and said they had a habit in this court of throwing the attorneys on the stand and asking them if any promises had been made, and I said that is the reason you can't make me any pomise, is it, and he said, yes, sir.

"Q. Had you not been expecting leniency and consideration for your client, for testifying in the case of *Commonwealth* v. *Noell Barbour,* would you have permitted him to have gone on the stand?

"A. I was believing that my client would be shown a great deal of consideration.

"Q. Was that the reason you permitted him to testify?

"A. That possibly had something to do with it, from this remark. I asked him about the lawyers being put on

the stand, and said is that the reason you can't promise him anything, and he says yes. That would tend to give one the impression that he would show leniency."

Mr. Carter Lee, the Commonwealth's atorney, then took the witness stand and testified upon direct examination in part as follows:

"This case came to a head around the 25th or 26th of January. We had at that time * * * accumulated what we termed to be probably all the evidence we could get, which implicated, I believe, about seven or eight people in this matter. Some of the information which we had afterwards turned out to be false, or else the people who told us went back on us. * * * [After his arrest] William Belcher was brought here from Roanoke * * * and in the presence of the officers * * * was told that he had the constitutional right not to talk, that I offered him no hope or reward, light punishment, or immunity, [but that] he could talk if he wanted to. He talked and denied it. * * *

"He was put in jail with Buster Patterson and next thing I knew, William Belcher either sent me word, or some officer told me, that William had said he knew Buster Patterson wasn't guilty of that offense. * * *

"I came to my office around dark, on either the 25th or 26th of January. Irving Belcher * * * and some others were there. I talked with Mr. [Irving] Belcher, and told him I had the best case against Noell Barbour, and his brother second. [I] mentioned the other boys (and purposely at the time left out the Becker negroes, who had been implicated in other ways), [and said] I had evidence on them.

"He * * * said his brother wasn't guilty. I said well, if he is not guilty he has got nothing to fear; and he talked about a confession. I said the thing for him to do is to tell it if he is not guilty, and if he is guilty, he had better keep his mouth shut. At no time did I make any statement to William Belcher, or Irving Belcher, that I would grant William Belcher any immunity, they repeatedly, Irving

Belcher, repeatedly, attempted to get me to commit myself on that ground, but every time I knew what I was going to do, I had in my mind to use him as a witness, and I told him as I was going to use him as a witness I would attend to him later, at no time did I offer him any hope of reward, or any light punishment. I have had so many conversations with Mr. Irving Belcher, probably in some of the conversations he may have said if he is not guilty, would he be prosecuted, and of course I said if your man is not guilty, and I know he is not guilty, I am not going to prosecute him. I was very careful, I knew the law relative admission of confessions, and I was careful not to say or do anything that would keep his confession from being admissible.

"Q. What happened after you took down his statement, as to when he would be indicted?

"A. He was told there, asked, do you want to be indicted now, or later on, and he and his brother both agreed he had better be indicted right along with the others, I made the statement to William and his brother that I would use him as a witness against the others, and attend to him later.

"Q. When you got the confession that morning, did you notify him that you didn't offer him any immunity?

"A. I told him in that conversation, in the presence of Lieutenant Morris, that I couldn't offer him anything, any hope of reward, light punishment, or anything."

Upon cross-examination Mr. Lee testified as follows:

"Q. What was the occasion of you asking William Belcher if he wanted to be indicted now or later on, if he wasn't expecting something?

"A. I didn't know what he was expecting, I knew I was going to use him as a witness, and knew he could be used as well before he was indicted as after, and thought maybe I would leave off indicting him until I got the other three, and then I would get him.

"Q. Didn't you put him on the witness stand to testify

against Noell Barbour, knowing that he was expecting consideration?

"A. I had made him no promises at any time, they tried to get me to say it, and tried to get me to say it, but at no time did I ever say I would promise him anything.

"Q. Didn't you get a statement from him prior to that time, knowing that he was expecting something?

"A. I imagine he was expecting something, but I was careful not to say anything that would prevent his confession from being admissible in evidence.

"Q. What do you consider the present value of the bond under which Mr. William Belcher is under?

"A. I don't know.

"Q. Don't you know it is not worth $15,000?

"A. I knew it wasn't worth $15,000 in the beginning.

"Q. Mr. William Belcher is the only one of the four charged with murder that has been bonded, is he not?

"A. Yes, sir.

\* \* \* \* \* \* \*

"Q. Did you make the statement to Mr. Irving Belcher that if William Belcher would make a statement of what he knew about this matter, that you would agree to his bond?

"A. I don't recall all the conversations, I know the reason I did bond him was because I was afraid if I kept him in jail he would go back on his agreement to testify, and I was humoring him along until I got the others safely tucked in the penitentiary, and then I thought I would attend to him.

"Q. You admit then that in getting the statement from William Belcher you more or less left him under a misapprehension?

"A. I did not. Any man ought to know when I have got the evidence on him, he is going to get convicted.

"Q. You admit you humored him along?

"A. Yes, sir. I humored him along by bonding him and keeping a watchout to see that he didn't skip.

"Q. Please state whether or not Mr. Paul Johnson approached you before his client, William Belcher, testified in the trial of Noell Barbour, and asked you what consideration he could expect, and you told him you couldn't promise him anything at all, because of the fact that you were liable to be called to the stand to state whether you had promised him anything?

"A. Mr. Johnson asked me if his client testified, was he going to be prosecuted, or whether he would get consideration, and I said I cannot promise your client anything. They have a habit here, when we get a confession, they put the lawyers on the stand to see if it has been done under any promise, and I says at this time I cannot promise your client anything.

"Q. And Mr. Johnson asked you is that the reason you can't promise him anything, and you replied yes?

"A. I said yes, that is the reason, he asked me and I said yes, that is the reason."

 The trial court, upon a consideration of this testimony, admitted Morris's testimony giving the substance of the alleged confession made by William Belcher in his presence. In this the court erred. The testimony of the Commonwealth's attorney shows that, though he may not have made any express promise of immunity, or light punishment to William Belcher, he intentionally so conducted his conversations with his brother and with him, and so shaped his language as to raise in the mind of William Belcher the hope and belief that, if he told what he knew about this crime and testified in behalf of the Commonwealth against the others who were implicated by his statement, he would not be prosecuted. A confession procured under such circumstances is not in law a voluntary confession, and is not admissible. The policy of the law of Virginia on this subject is to be found in section 8, article 1, of the Constitution of Virginia, and sections 4776, 4778, and 4781, Code Virginia 1919.

"Where the accused is led to believe that his statement

will have the effect to free him, such a powerful inducement is thus presented to his mind as to lead him to make it without regard to its truth or falsity, and hence it is involuntary." Wharton's Crim. Ev. (10th ed.) vol. 2, section 653a.

The only evidence introduced by William Belcher was the testimony of Eugene Sink and that of a large number of persons who testified that his reputation as a law abiding citizen was good. Sink was a witness of whom the Commonwealth had not known until he testified. He testified that on December 26th he and Noell Barbour were hunting near Patterson's cabin, and that Barbour told him that he had shot Patterson at his cabin the night before. While in the statement made to Sink by Barbour he stated that *"we went down there to get him out of the house,"* Sink's testimony throws no light on whom Barbour meant by "we," and neither connects Belcher or the Becker negroes with the crime nor excludes them from connection with it. It is silent on the point.

The Commonwealth introduced a number of witnesses, but there is no evidence sufficient to establish a connection of William Belcher with the killing of Patterson except his confession and the testimony of Noell Barbour, Henry Becker and Lewis Becker. If believed, the testimony of these three, or of any one of them, is sufficient, without Belcher's confession, to support a verdict finding William Belcher guilty, along with them, of Patterson's murder. But, had the confession not been admitted, the jury might not have believed the testimony of any of these men who had just been convicted of murdering Patterson and sentenced to serve terms of twenty years in the penitentiary, as the direct result of disclosures made by or testimony given by Belcher. In addition, while the two negroes, who had been confined in the same cell, told the same story, their testimony and that given by Noell Barbour is in conflict in many important particulars.

Though it is probable that the jury would have found the same verdict, had Belcher's confession been excluded, we

cannot say as a matter of law that the admission of the confession was harmless error. *Bram* v. *United States,* 168 U. S. 532, 18 S. Ct. 183, 42 L. Ed. 568; *People* v. *Loper,* 159 Cal. 6, 112 Pac. 720, Ann. Cas. 1912B, 1193; *State* v. *Nagle,* 25 R. I. 105, 54 Atl. 1063, 105 Am. St. Rep. 864; *People* v. *Brockett,* 195 Mich. 169, 161 N. W. 991; *Majors* v. *State,* 63 Tex. Cr. Rep. 488, 140 S. W. 1095; *Brent* v. *State,* 89 Tex. Cr. Rep. 544, 232 S. W. 845; *People* v. *Heide,* 302 Ill. 624, 135 N. E. 77.[1] Our attention has not been called to any Virginia case, nor have we found any Virginia case, in which the improper admission of a confession made by an accused has been held to be harmless error.

There is another very serious aspect of this matter. The record warrants the assumption that Noell Barbour was convicted principally upon the testimony of William Belcher. The evidence shows that this testimony was secured by the Commonwealth's attorney while Belcher was under arrest charged with having committed the same crime by leading him, both by words and conduct, to believe that, if he so testified as to fixing the crime on others, he would not be prosecuted though his testimony should show that he also was guilty; and that he testified against Barbour under the influence of such a belief.

In view of what the Commonwealth's attorney knew had taken place, he should not have permitted Belcher's testimony to have gone to the jury without any intimation to it that he was testifying under the belief that by so doing he himself would escape punishment or receive only a light punishment. If the practice followed in this case should be indulged in by prosecuting attorneys and tolerated by the courts, it would jeopardize the lives and liberties of innocent men and women everywhere.

There are other assignments of error, but the judgment

---

[1] But see *People* v. *Smith,* 251 Ill. 185, 95 N. E. 1041, in which there is a dictum to the effect that error in admitting defendant's confession is harmless, where independent of it, the undisputed evidence was so complete as to leave no reasonable doubt as to his guilt.

must be reversed because the court erred in admitting the confession, and as it is not probable that the same questions will arise in another trial of the case, we deem it unnecessary to discuss them here.

*Reversed.*