# Terry Williams

## V.

# Commonwealth of Virginia

Record Nos. 870102 and 870103

September 4, 1987

Present: All the Justices

*Robert J. Smitherman; E. L. Motley, Jr. (Meade, Tate & Daniel, P.C.,* on brief), for appellant.

*Robert B. Condon, Assistant Attorney General (Mary Sue Terry, Attorney General,* on brief), for appellee.

WHITING, J., delivered the opinion of the Court.

Terry Williams (Williams) was indicted on July 7, 1986, for the capital murder of Harris Thomas Stone (Stone) on November 2, 1985, while in the commission of the armed robbery of Stone. Code § 18.2-31(d). A second count of the indictment charged Williams with the robbery of Stone during the course of the capital murder.

On September 30, 1986, a jury found Williams guilty of both charges, fixing his punishment for robbery at seven years imprisonment. In a separate proceeding mandated by Code § 19.2-264.4, after hearing evidence of Williams' history, including aggravating

factors and mitigating evidence, the jury fixed Williams' sentence at death, based on his "future dangerousness." After considering the probation officer's report and other evidence in a further hearing, the trial court, by its order dated November 19, 1986, sentenced Williams to death for capital murder. Williams' appeal of the robbery conviction was certified to this Court, as authorized by Code § 17-116.06. We have consolidated that appeal and the automatic review of Williams' death sentence, Code § 17-110.1(A), with his appeal from his conviction of capital murder, Code § 17-110.1(F), and given both priority on our docket as required by Code § 17-110.2.

## I. THE EVIDENCE

We must view the evidence in the light most favorable to the Commonwealth because it was the prevailing party in the trial court. Stone, an elderly man who resided on Henry Street in Danville, was found dead in his bed shortly before 2:00 a.m. Sunday, November 3, 1985. There was no sign of a struggle, no blood was observed on Stone's body, and he was fully clothed. Despite a diligent search, Stone's wallet, which he customarily kept fastened in the back pocket of his pants, was never found.

The local medical examiner, who examined the body about 9:30 that Sunday morning, noted an abrasion on the chest, but no bruising. Stone's history of heart disease and the police failure to report anything suspicious about the circumstances of Stone's death led the local medical examiner to conclude that Stone's death was due to heart failure. However, when Stone's blood alcohol content was later analyzed and was reported to be 0.41%, the regional medical examiner's office in Roanoke amended the finding of the cause of death to alcohol poisoning. Stone's daughter testified Stone looked "a little high" when she last saw him entering his house shortly after 6:00 p.m. on Saturday, November 2, 1985.

When the funeral director, Jack Miller, observed Stone's body on Monday morning, he called a bruise or abrasion over the left ribs to the attention of the police. The police told Miller that the local medical examiner believed the bruise was an old one. Though Miller disagreed with the local medical examiner, on instructions from the police he embalmed the body.

Almost six months later, the chief of police in Danville received an anonymous letter from an inmate of the local jail in which the

author admitted killing "that man Who Die on Henry St." The police interviewed Williams, an inmate of the Danville jail at the time, who eventually admitted that he had written the letter and later gave multiple confessions to the murder and robbery of Stone. Williams said he had first struck Stone in the chest, and later on his back, with a mattock and had removed three dollars from Stone's wallet.

Stone's body was exhumed. On July 2, 1986 Dr. David Oxley, a forensic pathologist and Deputy Chief Medical Examiner for Western Virginia, performed an autopsy. When Dr. Oxley opened the body, he found Stone's fourth and fifth ribs on the left side had been fractured and displaced inward, puncturing the left lung and depositing a quantity of blood in the left chest cavity.

## II. ADMISSIBILITY OF STATEMENTS MADE BY WILLIAMS TO THE POLICE

At trial the defendant moved to suppress his incriminating statements, contending that at the time he gave them he was emotionally confused, under duress, and not competent to give an accurate statement and thus unable knowingly and intelligently to waive his constitutional rights. The trial court denied the motion.

■ The burden is upon the Commonwealth to prove, by a preponderance of the evidence, that Williams' statement was voluntary. *See Rodgers* v. *Commonwealth*, 227 Va. 605, 608, 318 S.E.2d 298, 300 (1984); *Stockton* v. *Commonwealth*, 227 Va. 124, 140, 314 S.E.2d 371, 381, *cert. denied*, 469 U.S. 873 (1984); *Griggs* v. *Commonwealth*, 220 Va. 46, 49, 255 S.E.2d 475, 477 (1979); *McCoy* v. *Commonwealth*, 206 Va. 470, 474, 144 S.E.2d 303, 307 (1965). Whether a statement is voluntary is ultimately a legal rather than a factual question, but subsidiary factual questions are entitled to a presumption of correctness. *See Miller* v. *Fenton*, 474 U.S. 104, 110-12 (1985); *Gray* v. *Commonwealth*, 233 Va. 313, 324, 356 S.E.2d 157, 163 (1987). Moreover, *Rodgers* points out that following a trial court's finding of voluntariness, the scope of our appellate review is limited to determining whether the evidence supports the finding. The trial court's finding on this issue is entitled to the "same weight as a fact found by a jury, and that finding will not be disturbed on appeal unless plainly wrong." *Rodgers*, 227 Va. at 608-09, 318 S.E.2d at 300.

The defendant injected himself into this case by writing a letter to the chief of police in which he said:

I can't write or spell too good So Please bare with me. I know what I am saying and what I'm going to Do. I call Capt. Dose, back in Feb. of this year one night at 2:25 p.m. and told him about that man Who Die on Henry St. I said that I might have known what happen to him, but I didn't Leve my name. Well, I kill him myself. And all them cars That someone when in while Those pleople were at work, I when in those cars. Mills, Holetells, on the streets, Just about all over Danville, and also that Lady on W. Green St. I did it, but I am very sorry I did. I just can't hole all of this inside of me. It's getting to the pont that I don't know who I am anymore. I will only talk with you, please.

After that letter was received, two detectives interviewed the defendant, and he implicated himself in the crime, explaining to the detectives that his conscience was bothering him and he wanted to talk to somebody. In a taped statement Williams explained his reason for confessing by saying, "I couldn't live with myself no more with what I had done to these two people. And I just wish I could get some help from somebody." After having spoken with his relatives, Williams recanted the statements, claiming that he was having some kind of nightmares and dreams. However, he reaffirmed the statements a few days later.

A clinical psychologist found Williams to be of low intelligence but that he had a good understanding of court procedures and was capable of understanding his rights and making a knowing and voluntary waiver of them. He also concluded that Williams' claims of dreams and hallucinations were "malingered claims." A forensic psychiatrist who examined Williams did not believe he experienced hallucinations but that he had an unexplained "unusual power through dreams to visualize something that has happened in the past." The psychiatrist indicated Williams was not suffering from mental illness or defect and was competent to give statements to the police. This evidence convinces us that the trial judge had ample grounds to support his finding that Williams was competent to make the statements to the police.

Williams now attacks the voluntariness of his statements, asserting that they were induced by a promise of reward. It is true, as the defendant contends, that a "confession is inadmissible where it [is] induced by the hope of the gain of some advantage or to avoid some evil in reference to the proceeding against the de-

clarant." *Jackson* v. *Commonwealth*, 116 Va. 1015, 1020, 81 S.E. 192, 194 (1914); *see Brady* v. *United States*, 397 U.S. 742, 753 (1970).

However, the cases relied upon by Williams are inapposite on their facts. In *Jackson,* we said "the confession was induced by the hope, inspired by what [the sheriff's agent] had said to [Jackson], that he would thereby escape the extreme penalty of the law for this offense [of murder]." *Jackson,* 116 Va. at 1019, 81 S.E. at 193. In *Macon* v. *Commonwealth*, 187 Va. 363, 46 S.E.2d 396 (1948), we reversed a criminal conviction based solely on a confession which the defendant later repudiated and which was "itself . . . based on supposed facts proven untrue and is incredible."[1] *Id.* at 378, 46 S.E.2d at 403. In *Belcher* v. *Commonwealth*, 160 Va. 891, 168 S.E. 468 (1933), we found that a Commonwealth's Attorney had:

> intentionally so conducted his conversations with [the accused's] brother and with [the accused], and so shaped his language as to raise in the mind [of the accused] the hope and belief that, if he told what he knew about this crime and testified in behalf of the commonwealth against others who were implicated by his statement, he would not be prosecuted.

*Id.* at 905, 168 S.E. at 473.

 This brief recital of the facts in these cases is sufficient to show their inapplicability to this case. The most Williams can say is that "[t]he two police officers obtained [my] confession by raising [my] hopes of obtaining psychological and mental 'help.'" This falls far short of a confession induced by the hope of gaining some advantage or avoidance of some evil in reference to the proceeding against the defendant. *See Townes* v. *Commonwealth*, 214 Va. 683, 685, 204 S.E.2d 269, 271 (1974).

 Williams makes the subsidiary contention that his various confessions are internally inconsistent, and are contradicted by

---

[1] The defendant in *Macon* testified that the Commonwealth's Attorney, who induced the confession, was a friend of hers, who "led me to believe it was the thing to do; I was led to believe there would be no punishment." One of the participants to the conversation denied that the Commonwealth's Attorney made any such statements, but this conflict played little part in the resolution of the case. *Macon* v. *Commonwealth*, 187 Va. at 370, 46 S.E.2d at 400.

other evidence in the case, making them less reliable. The credibility, weight, and value of confessions are all jury matters. *Mathews* v. *Commonwealth*, 207 Va. 915, 918-19, 153 S.E.2d 238, 240 (1967); *Noe* v. *Commonwealth*, 207 Va. 849, 852-53, 153 S.E.2d 248, 250 (1967). We must assume that this jury considered the alleged inconsistencies and resolved them against the defendant, as it had a right to do under the evidence in the case.

For the reasons assigned, we find no error in the trial court's conclusion that the confessions were voluntary.

## III. PROOF OF CORPUS DELICTI

### A. Fact of Robbery.

The defendant contends that the Commonwealth failed to prove the corpus delicti of robbery, a prerequisite for his conviction of capital murder and of robbery. The defendant recognizes that his confessions may be sufficient to establish the corpus delicti, but contends that there is insufficient reliable evidence corroborating his statements.

■ While the corpus delicti cannot be established by a confession of the accused uncorroborated by other evidence, *Reid* v. *Commonwealth*, 206 Va. 464, 468, 144 S.E.2d 310, 313 (1965) when the defendant has fully confessed the crime, "only slight corroborative evidence is necessary to establish the corpus delicti." *Clozza* v. *Commonwealth*, 228 Va. 124, 133, 321 S.E.2d 273, 279 (1984), *cert. denied*, 469 U.S. 1230 (1985).

Shortly after the body was discovered fully clothed, the wallet was found to be missing from the rear pants pocket. Despite a diligent search of the entire house shortly thereafter, the wallet was never found.

The daughter with whom the deceased lived testified that Stone had been paid two days before he died, noting, "I knew it was something he didn't do was take his wallet out of his pocket. Even when he would go to bed at night he would take his pants off and hang them on the foot of the bed, but his pants pocket would still be fastened . . . [w]ith his wallet."

■ This evidence, coupled with Williams' confession that he took the wallet from the decedent's pocket after killing him, removed some money, and then threw the wallet into a river, corroborates the corpus delicti of the robbery.

■ Williams suggests that the wallet may have been taken either by the first persons to enter the house just after the murder or by others who entered later, casting the burden upon the Commonwealth to produce evidence to the contrary. Neither hypothesis springs from the evidence and both must be rejected. Responding to a similar contention in *Turner* v. *Commonwealth*, 218 Va. 141, 148, 235 S.E.2d 357, 361 (1971), we said, "the hypotheses which must be reasonably excluded are those which flow from the evidence itself, and not from the imagination of defendant's counsel."

## B. Cause of Death.

Williams additionally contends that the Commonwealth failed to prove the cause of death and therefore did not establish that portion of the corpus delicti of the offense. This argument is based upon the conflicting testimony of the local medical examiner, who first opined without the benefit of an autopsy that the cause of death was natural, either heart failure or alcohol poisoning. He said that his opinion was "somewhat [a] guess because there was no autopsy" and to be sure the skin would have to be incised. The local medical examiner did not examine Stone's body when the autopsy was conducted almost six months later. However, the regional medical examiner who conducted that autopsy testified that the decedent died after being struck in the chest with blunt force.

■ The alleged conflict in the testimony of these two experts was a matter for the jury to resolve. *Opanowich* v. *Commonwealth*, 196 Va. 342, 354, 83 S.E.2d 432, 440 (1954). No litigant is bound by contradicted testimony of a witness even though proffered by the litigant. The jury must resolve any conflict between the witnesses. *Travis* v. *Bulifant*, 226 Va. 1, 4-5, 306 S.E.2d 865, 866 (1983); *Massie* v. *Firmstone*, 134 Va. 450, 462, 114 S.E. 652, 656 (1922). We conclude, therefore, that the corpus delicti was adequately established both as to the robbery and the cause of death.

## IV. PHOTOGRAPHS OF THE BODY

Defendant argues that reversible error was committed in the introduction of three photographs taken of Stone's body during the autopsy. The trial court reviewed all of the 20 or more photographs offered and allowed only three to be used before the jury,

finding that as to those three exhibits, "[t]he utility of their evidence outweighs any prejudicial value that might be involved." The medical examiner used those three photographs to illustrate the damage done by the blunt force blow to the victim's chest, the bleeding into the chest cavity and the compression of the lungs which brought about Stone's death.

█ Admissibility of photographs of the body of a murder victim is a matter within the sound discretion of the trial court. *Jones* v. *Commonwealth*, 228 Va. 427, 450, 323 S.E.2d 554, 566-67 (1984), *cert. denied*, 472 U.S. 1012 (1985); *Washington* v. *Commonwealth*, 228 Va. 535, 551, 323 S.E.2d 577, 588 (1984), *cert. denied*, 471 U.S. 1111 (1985); *Clozza*, 228 Va. at 135, 321 S.E.2d at 280; *Stockton*, 227 Va. at 144, 314 S.E.2d at 384; *Peterson* v. *Commonwealth*, 225 Va. 289, 294, 302 S.E.2d 520, 523-24, *cert. denied*, 464 U.S. 865 (1983). This is true even though they may have been taken during the autopsy. *Poyner* v. *Commonwealth*, 229 Va. 401, 417, 329 S.E.2d 815, 827, *cert. denied*, 474 U.S. 865 (1985); *Bunch* v. *Commonwealth*, 225 Va. 423, 436-37, 304 S.E.2d 271, 278, *cert. denied*, 464 U.S. 977 (1983); *Clanton* v. *Commonwealth*, 223 Va. 41, 52, 286 S.E.2d 172, 177 (1982). We find the trial court did not abuse its discretion in admitting these photographs.

## V. ALLEGED IMPEACHMENT OF COMMON-WEALTH'S EXPERT WITNESS

Williams maintains that the court erroneously permitted the Commonwealth to impeach one of its witnesses, the local medical examiner, whose testimony allegedly proved adverse to the Commonwealth. The local medical examiner explained that a bruise may not appear on a body until a day or so after death. Initially he testified that he had seen the body only on Sunday morning and had noticed no bruise at that time. However, on cross-examination, the local medical examiner said he saw the body on the following Monday without noticing hemorrhaging (and therefore bruising). Subsequent direct, redirect, cross-examination, and re-cross-examination disclosed some equivocation as to the second view, and the Commonwealth's Attorney was permitted on two different occasions to ask him if he was "sure" of his second visit. The doctor concluded by affirming the second visit.

Williams misconceives the situation. Impeachment involves an attack on the credibility of a witness. Evidence offered to impeach

the witness cannot be considered for any purpose except that of "contradicting the witness." Code § 8.01-403. The questions put to the local medical examiner were simply to resolve an apparent inconsistency in his testimony and introduce his best recollection.

Furthermore, one common method of impeachment is to show that the witness has made a statement on some *prior* occasion inconsistent with the testimony given at trial. Code § 8.01-403; *Cassady* v. *Martin*, 220 Va. 1093, 1099, 266 S.E.2d 104, 107 (1980); *Neblett* v. *Hunter*, 207 Va. 335, 340, 150 S.E.2d 115, 119 (1966). In this case, the Commonwealth's Attorney was not asking the witness about statements made at some time and place *prior* to trial, but about his earlier testimony *in the trial*, and in so doing he was attempting to remove "any obscurity, uncertainty, or distortion that may have been created by the cross-examination."

Finally, as we noted in *Daniels* v. *Morris*, 199 Va. 205, 212, 98 S.E.2d 694, 699 (quoting, *Butler* v. *Parrocha*, 186 Va. 426, 433, 43 S.E.2d 1, 5 (1947)):

> The trend of Virginia decisions is to relax the strict rules of evidence in the interest of developing the whole truth on all issues. The general rule adopted gives great latitude to the discretion of the trial court as to the order in which witnesses may be called and the manner of their examination. The exercise of this discretion will not be disturbed unless it has been abused or substantial harm has been done to the complaining party.

We hold that the trial court did not err in permitting the Commonwealth's Attorney to examine his witness in order to clarify the dates and times the witness saw the body.

## VI. MEANING OF A LIFE SENTENCE

Williams complains that the trial court refused to let him, at the penalty stage of trial, argue the meaning of a life sentence. Williams reasons that because the prosecution could not argue that parole or pardon might be available to the defendant in a life sentence, "the defendant should have the right to argue to a jury that the lesser sentence is a sentence for life imprisonment, until the defendant dies. Any lesser definition would have to deal with

parole, pardon, and probation."[2] We reject this inventive but spurious argument.

If the jury is not to be concerned with what may later happen to a defendant sentenced to the penitentiary, no inference can be drawn *or argued* one way or the other as to whether he will serve his full term. A reduced sentence is not the responsibility of the judiciary but of the executive department, *Hinton* v. *Commonwealth*, 219 Va. 492, 496, 247 S.E.2d 704, 706 (1978); *Dingus* v. *Commonwealth*, 153 Va. 846, 852, 149 S.E. 414, 415 (1929), and argument as to what that department might do encroaches upon the separation of their functions.[3] *Hinton*, 219 Va. at 496, 247 S.E.2d at 706. Since the Commonwealth is not permitted to argue about the possibility of a reduced sentence by way of probation, parole, or pardon, because the jury might be inclined to "handicap" the length of its sentence to factor in that possibility, the obverse is equally true. If the defendant is permitted to argue his inability to obtain a reduced sentence, there is an equal danger that the jury may reduce its sentence because of its feeling that probation, parole, or pardon is not probable.

In an unvarying line of decisions we have held that the Commonwealth's Attorney may not argue the possibility of executive clemency, *Dingus*, 153 Va. at 851-52, 149 S.E. at 415, nor may the court make any comment to the jury about what might happen after the sentence is imposed. *Hinton*, 219 Va. at 496, 247 S.E.2d at 706; *Wansley* v. *Commonwealth*, 205 Va. 412, 417, 137 S.E.2d 865, 869 (1964), *cert. denied*, 380 U.S. 922 (1965); *Jones* v. *Commonwealth*, 194 Va. 273, 276, 72 S.E.2d 693, 694 (1952). This principle applies in capital murder cases as well. *Poyner*, 229 Va. at 432, 329 S.E.2d at 832; *Peterson*, 225 Va. at 296-97, 302 S.E.2d at 525; *Clanton*, 223 Va. at 55, 286 S.E.2d at 179-80; *Turner* v. *Commonwealth*, 221 Va. 513, 531, 273 S.E.2d 36, 48 (1980), *cert. denied*, 451 U.S 1011 (1981); *Clark* v. *Commonwealth*, 220 Va. 201, 214, 257 S.E.2d 784, 792 (1979), *cert. denied*, 444 U.S. 1049 (1980). Indeed, in *Poyner* we held that a trial judge was correct in refusing to define "life imprisonment" for a jury, simply reminding the jury of its duty to punish the defendant in accordance with the law stated in the instructions if they should

---

[2] The defense argued as follows: ". . . the two worst things that could happen to a person, locked up for the rest of his life or sentenced to death. A life sentence means he is away from the public for the rest of his life. The public's safer, he will there be seen . . ."

[3] A trial judge may reduce the jury's death sentence under Code § 19.2-264.5.

find guilt. We pointed out that "[t]he jury has no right to be advised of post-sentencing events." 229 Va. at 432, 329 S.E.2d at 836.

We decline to permit defendants to inject such a manifestly improper and unfair consideration into a jury argument in a criminal case.

## VII. ARGUMENTS OF COMMONWEALTH'S ATTORNEY

Defendant contends that the following argument of the Commonwealth's Attorney in the penalty phase of the case was improper and requires reversal:

> [Defense] counsel says, 'We're not saying don't punish him,' but a few hours ago counsel was arguing that the other people going through the Stone house could have stolen the wallet, that the Commonwealth didn't prove beyond a reasonable doubt the cause of death. Of course you rejected all of that and you found the defendant guilty of murdering Mr. Stone in the commission of robbery. So this business of saying, oh, we're not saying don't punish him, that's now, it wasn't a few hours ago.

This argument by the Commonwealth's Attorney appeared to be the beginning of an attack upon defense counsel's alternate position taken in the closing argument during the penalty phase of the case. The Commonwealth's Attorney's argument should not have been permitted. Defense counsel had the right to argue alternative defense positions, given the fact that the jury had rejected his argument upon the first position taken in the guilt phase of the case.

We do not find that the argument of the Commonwealth's Attorney prejudiced the defendant's status before the jury. At most it was an effort to capitalize on the allegedly inconsistent positions taken by defense counsel. We believe the jury understood this as "lawyer talk" and had the common sense to treat it as such.

We found no cases, and Williams does not cite any, which discuss criticisms of inconsistent positions taken by counsel. Considering this argument against the background of the entire case, we find no prejudicial error in the trial court's failure to sustain the objection to the argument of the Commonwealth. As we said in

*Harris* v. *Commonwealth*, 133 Va. 700, 708, 112 S.E. 753, 755 (1922):

> Every person accused of crime, whether guilty or innocent, is entitled to have all his legal rights protected during his trial. And in a criminal case, the Commonwealth's attorney, as the representative of the people, should guard against any violation of his rights in this respect. But if every improper remark of counsel were ground for reversal, comparatively few verdicts would stand, since the most eminent counsel are sometimes led into such inadvertencies. Appellate courts, therefore, hesitate to interfere by granting a new trial, except where the prosecuting attorney has so clearly departed from the line of legitimate procedure that any reasonable person will conclude *that the jury were certainly prejudiced thereby.*

(Emphasis in original.)

Williams contends further that the Commonwealth's Attorney improperly argued before the trial court at the sentencing hearing that Williams' plea of not guilty was also a denial of his confession, indicating a continued lack of remorse. Williams' premise is that a plea of not guilty only "puts in issue . . . guilt or innocence . . . but does not act to deny any evidence the prosecution presents."

The premise is faulty — the plea controverts the existence of every fact essential to establish the accused's guilt. *See Neal* v. *Commonwealth*, 124 Va. 842, 847, 98 S.E. 629, 630 (1919); *Potts* v. *Commonwealth*, 113 Va. 732, 734, 73 S.E. 470, 471 (1912); *accord Roe* v. *United States*, 287 F.2d 435, 440 (5th Cir.), *cert. denied*, 368 U.S. 824 (1961); *United States* v. *De Angelo*, 138 F.2d 466, 469 (3d Cir. 1943); *People* v. *Aquilante*, 208 Cal. App. 2d 530, 536, 25 Cal. Rptr. 344, 348 (1962); *State* v. *Golden*, 67 Idaho 497, 501, 186 P.2d 485, 487 (1947). We hold that a plea of not guilty also contests the validity and admissibility of a confession.

Furthermore, Williams recanted the confessions before the judge when he described them as dreams in his testimony during the suppression hearing. His continued denial of involvement was a material consideration in assessing his protestations of remorse at sentencing.

Finally, we note that the argument was before the court and not the jury. A trial judge is uniquely capable because of his training, experience and judicial discipline to disregard potentially prejudicial argument during the mental process of adjudication. *See Eckhart v. Commonwealth*, 222 Va. 213, 216, 279 S.E.2d 155, 157 (1981). We must assume that the trial judge did not penalize Williams because he pled not guilty and denied his confession in the suppression hearing, but merely considered those matters as evidence of Williams' recent attitude about this crime and his other criminal activities.

We find no merit in this assignment of error.

## VIII. FAILURE OF THE COURT TO MENTION MITIGATING FACTORS IN ARTICULATING ITS REASONS FOR THE SENTENCE

Williams asserts that the court's opinion "clearly shows that it based its decision only on the criminal history reported in the post sentence report, not considering other mitigating circumstances." The trial judge's oral articulation of his reasons for sustaining the death sentence did not specifically mention the mitigating circumstance of Williams' being the first person to arouse suspicion that Stone's death was not from natural causes. However, the trial judge did say he considered the post sentence report that described that mitigating circumstance. Any doubt about the matter was laid to rest in the court's sentencing order, which expressly stated that the court had considered "all of the evidence in this case, the report of the Probation Officer, the matters brought out on cross-examination of the Probation Officer and such additional facts as were presented by the defendant. . . ."

Accordingly we reject this assignment of error.

## IX. EVIDENCE OF ANOTHER CRIME

Williams argues that reversible error was committed in the introduction of evidence concerning a brutal assault on an elderly woman by Williams shortly after Stone's murder that resulted in a malicious wounding conviction. Williams would confine the Commonwealth to "simply presenting this crime as part of his past criminal history," but the very statute relied upon by the defendant requires a consideration of "the history and background of the defendant." Code § 19.2-264.4(B). We have construed this

statute to authorize the introduction of the details of other criminal conduct. *Edmonds* v. *Commonwealth*, 229 Va. 303, 329 S.E.2d 807, *cert. denied*, 474 U.S. 975 (1985); *Watkins* v. *Commonwealth*, 229 Va. 469, 331 S.E.2d 422 (1985), *cert. denied*, 475 U.S. 1099 (1986); *Stamper* v. *Commonwealth*, 220 Va. 260, 257 S.E.2d 808 (1979), *cert. denied*, 445 U.S. 972 (1980).

The details of that malicious wounding, which occurred in March of 1986, only six months before the trial, were highly relevant in assessing Williams' "future dangerousness." Our review of the evidence fails to disclose any indication of what Williams describes as "passion created by the emphasis on that specific prior conviction." Therefore, we find no merit in this assignment of error.

## X. EXCESSIVENESS AND PROPORTIONALITY

The defendant's mother testified that the defendant was never violent at home and that she did not believe he was a threat to others. A female acquaintance of the defendant who had known him for about 11 years said he was never violent around her, as did another witness whose foster daughter formerly dated the defendant. Contrasted with that testimony was an extensive criminal record of larcenies and burglaries beginning when Williams was 11 years old, including a robbery in 1976, a burglary involving an assault upon the victim in 1982, and a vicious and brutal malicious wounding of an elderly lady on March 5, 1986, that caused extensive brain damage and left her a "vegetable." There was also some evidence of a December 1985 assault by Williams upon an old man while Williams was committing an arson of the victim's home. Two forensic psychological experts who examined Williams were of the opinion that there was a high probability that he would commit future criminal acts of violence and that he constituted a continuing threat to society.

We have reviewed the record in this case in conformity with the mandate of Code § 17-110.1(c) to determine whether the sentence is excessive or disproportionate to other death penalty cases. This review convinces us that the sentence is not excessive or disproportionate.

We have also reviewed the accumulated records in all capital murder cases subsequent to the present capital murder statute's effective date, paying particular attention to those cases in which the death penalty was imposed solely upon the consideration of

"future dangerousness." *See Pope* v. *Commonwealth*, 234 Va. 114, 360 S.E.2d 352 (1987) (this day decided); *Peterson* v. *Commonwealth*, 225 Va. 289, 302 S.E.2d 520; *Evans* v. *Commonwealth*, 222 Va. 766, 284 S.E.2d 816 (1981), *cert. denied*, 455 U.S. 1038 (1982); *Giarratano* v. *Commonwealth*, 220 Va. 1064, 266 S.E.2d 94 (1980); *Stamper*, 220 Va. 260, 257 S.E.2d 808. That review convinces us that the jury sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor, nor is it excessive or disproportionate to the penalty imposed in similar cases, considering the crime and this defendant. We find that juries generally impose the death penalty in cases similar to this case.

Because we find no error, we affirm the convictions and judgments appealed from.

Record No. 870102 *Affirmed.*
Record No. 870103 *Affirmed.*