# Richmond

## Mary Louise Hundley Macon v. Commonwealth of Virginia.

March 1, 1948.

Record No. 3336.

Present, All the Justices.

The opinion states the case.

*James T. Gillette* and *Thomas L. Woodward*, for the plaintiff in error.

*Harvey B. Apperson, Attorney General*, and *Henry T. Wickham*, for the Commonwealth.

STAPLES, J., delivered the opinion of the court.

The defendant (plaintiff in error), at a trial upon an indictment for the murder of Andrew C. Thomas, was found guilty of voluntary manslaughter and sentenced to one year in the penitentiary. The verdict of the jury had so fixed the punishment "with the recommendation of clemency."

The only evidence in the record of any act of the defendant from which an inference of her guilt can be drawn is a written confession, to the admission of which the defendant excepted on the ground that it had been procured by threats and inducements made and held out to her by the Commonwealth's Attorney and the sheriff. In addition to other assignments, she also assigns as error the trial court's refusal to set aside the verdict because contrary to the law and the evidence.

The testimony in the case is quite voluminous. In view of the jury's verdict, it will be considered from the standpoint most favorable to the Commonwealth.

The defendant lived with her mother, Mrs. Hundley, at the latter's home in the small town of Ivor, in Southampton county. The deceased lived near Petersburg but usually visited them once or twice a week, and on such visits slept in a room provided for him in Mrs. Hundley's home. There had been a short period during which sexual intimacy had occurred between defendant and deceased. Although this had come to an end about six months before, his social visits had continued. October 4, 1946, was an occasion of one of these visits. About ten o'clock that night the deceased and defendant returned home in his automobile from a church conference which both had attended. Her mother, Mrs. Hundley, had already retired. The defendant had some business letters to write so the two went into the dining room where they occupied seats across from one another at a table. She wrote a number of letters and addressed envelopes for them while he worked on a crossword puzzle. Mrs. Frances Davis was in her bedroom in the house next door about twenty or twenty-five feet away.

There was a narrow driveway between the houses. At twenty minutes to twelve she heard the sound of a shot, which seemed to come from the Hundley house. This was followed immediately by a noise like someone sobbing and crying. She then raised the window to find out what was the matter and heard more distinctly the same noise. A few minutes later she notified Mr. and Mrs. Saunders, in whose home she lived. Mr. Saunders and his brother walked out into the driveway between the two houses to explore the situation. They also heard a woman groaning as if in distress or suffering. The voice was in the dining room and seemed to be moving slowly toward the hallway at the front of the house. They did not go in the house, however, but walked down the street a short distance, and, seeing a light in Mrs. Hundley's room and one go on a few minutes later in defendant's bedroom, they concluded there was no serious trouble and returned home.

In the meantime defendant's mother, Mrs. Hundley, had been awakened a short time before by the opening of the downstairs door and a rushing through it of someone out into the street and a return and a shutting of the door. She was still awake when she heard a report which evidently was the shot from deceased's pistol, although she did not so identify it at the time. About the same time that the Saunders brothers were standing in the driveway, Mrs. Hundley heard her daughter struggling to get her breath and groaning in the hall downstairs. She went into the upstairs hall and looked down and saw the defendant crawling on her hands and knees and groaning, and apparently trying to get her breath. She went down and helped her up the steps, and into Mrs. Hundley's room. She proceeded to undress the defendant and, finding that her clothing was wet due to a discharge from her bladder which had occurred, she went in search of some dry clothing. In order to find it she turned on the light in defendant's room, which the Saunders brothers observed go on while they were standing in the street. She was alarmed over her daughter's condition and feared that she had been given poison as she was

unable to talk and was mentally dazed. After putting her to bed Mrs. Hundley went downstairs to see if she could find the decedent, Mr. Thomas, and have him call a doctor. She discovered his body, however, lying in the dining room. This excited and frightened her. She returned to her own room, hastily slipped on a dress and rushed over to the Saunders' home next door to summon aid. Mr. Saunders, a witness for the Commonwealth, testified that Mrs. Hundley came to his side door and called for him to open it. He asked, "What is the matter, Mrs. Hundley?", and she stated that her daughter "had come to her room and she couldn't find out a thing from her; that she was very nervous, and that Mr. Thomas had killed himself." Dr. Babb, another Commonwealth's witness, was then called and arrived at the home a short time after Mr. Saunders and his brother had come in. When the doctor arrived he was told that Mr. Thomas was dead and he could not be of any help to him, but that the defendant, Mrs. Macon, was very ill and needed his attention. He then went upstairs to Mrs. Hundley's room, where the defendant was in bed. His testimony at the trial was that he found her "out of her head, in my opinion; she couldn't answer anything, just like a person who had gone through some terrific emotion or experience; she wouldn't answer questions, couldn't say anything." He further testified that after giving her a hypodermic, in about ten minutes she was able to tell him that her throat hurt. The doctor had suspected she might have been poisoned, but an examination disclosed this was not true. He found, however, that she had four bruises on the left side of her neck and one which he presumed to be a thumb print on the right side. The pattern of these bruises corresponded to a human hand applied with a great deal of violence. Dr. Babb further testified at the trial that, while the defendant was not in a coma and was not exactly unconscious, "nevertheless, her higher centers, those things that reason things out; they were just as dead as could be." When questioned as to the effect on a person of having been choked and rendered unconscious, he said: "Choking would be just

like any other condition where a person would be rendered insensible; the sphincters would relax, and if there was anything in the bladder, it would come out." Such an evacuation, he said, is a result to be ordinarily expected from a condition of unconsciousness. He also testified that the report of a gun shot is a sufficient stimulus to restore an insensible person to consciousness. In this connection Sheriff Bell testified that on the night of the tragedy Dr. Babb told him that he, the sheriff, could not talk to the defendant; "that her throat was bruised on the inside; that she had been choked and *passed out* and couldn't have known anything about the shooting;" that Dr. Babb told him further "that it was a wonder the woman was alive the way she was choked." When Dr. Babb called on his patient the next morning, he found that the bruises had turned to a deep bluish color and could be very distinctly seen from across the room.

Sheriff Bell arrived on the scene about twelve-thirty o'clock that night and, together with the Saunders brothers and Dr. Babb, made an examination of the body of the deceased and the surrounding conditions. They saw no sign of any disorder in the room, and the clothing and necktie of the deceased were in a normal undisturbed condition. One of the lenses of the defendant's eyeglasses was on the floor and another part, with the right templet, was found under the body of the deceased. He was lying on his back with one leg propped up against the table leg and was in about the middle of the room, parallel to the table. He had been shot straight through the head, the bullet having penetrated at a point just above the right ear and rested in substantially the same place just under the skin on the left side of the head. There was a powder mark about the size of a half dollar around the hole where the bullet entered. This showed the pistol was not less than two nor more than six inches away when it was fired. A pistol was found in his right hand, his thumb extending through the trigger guard and pressing against the trigger. We will consider later, in more detail, the testimony relating to the pistol.

The sheriff, having been forbidden by the doctor to see the defendant that night because of the effect of the choking, returned next morning about ten o'clock and had a talk with her. She told him that she and the deceased had been sitting across the table from one another, she writing letters and he apparently working on a crossword puzzle. They did not engage in conversation. About eleven-thirty she arose and said it was time for her to go to bed. Deceased then got up and came around to her side of the table, with his hands reaching out toward her. She remembered him putting his hands on her throat and that was the last thing she did remember, except a vague recollection of her mother helping her to her room. There had been no quarrel or unpleasantness at all between her and the deceased that night. She had not seen a pistol and did not know he had one with him. She did not know Mr. Thomas was dead until next morning when her mother told her. This same account of the events of that night she repeated to the sheriff and Mr. Pulley, Commonwealth's Attorney, at a number of subsequent interviews. It was also the substance of her testimony at the trial. Then came the night of the confession.

It appears from the testimony of the sheriff that he and Commonwealth's Attorney Pulley were not satisfied with the defendant's statements to them and suspected her of having shot the deceased, though no reason was given for this suspicion. They determined, therefore, to try to get her to confess her guilt. To accomplish this they wanted to get her away from her mother because, the sheriff testified, her mother would help her if present. Pursuant to and in accordance with a plan which had been agreed upon previously between the sheriff and Mr. Pulley "in order to break the case," the following events occurred.

On October 17, nearly two weeks after the tragedy, Sheriff Bell called upon the defendant and engaged her in conversation, alone, in her mother's dining room. He says he accused her of killing Mr. Thomas and she began to cry. He then suggested that they take a drive in his auto-

mobile and she agreed. About a block away he picked up Mr. Pulley, who was waiting for him, and they drove out on State Highway No. 460 for a distance of about a mile and a half, where they parked on the side of the road. At this point Mr. Pulley, who had been riding on the front seat, moved and sat on the back seat by the side of the defendant. The sheriff turned on his knees on the front seat and faced the defendant. The foregoing facts are not in dispute, but the controversy is as to what occurred from that time on. The defendant testified that they told her that no one would believe her account of the accident, and that the best thing she could do for her own interest was to admit that she had shot the deceased because she was in fear of serious bodily harm and to prevent him from raping her. That this would constitute a legal defense. If she did not do this relatives of deceased would have her indicted for first degree murder. Addressing Mr. Pulley, the Commonwealth's Attorney, who was cross-examining her, she said, "You led me to believe it was the thing to do;" "I was led to believe there would be no punishment;" that the Commonwealth's Attorney had said to her, "Hell, you know damn well nobody will believe that story." She testified further that she would not have made the confession "but you said I could claim self-defense." This testimony is corroborated by the fact that there was incorporated in the confession a suggestion of self-defense and prevention of rape. She testified further that these two officers, in effect, concocted the whole story by asking her if she didn't do the specific acts referred to and under the particular circumstances set out in the paper she signed. In other words, that they put the whole confession in her mouth by suggestions and asking questions. The Commonwealth's Attorney did not take the witness stand to refute these statements, but they were denied explicitly by the sheriff in response to questions asked him by the Commonwealth's Attorney. While this witness denied that he or Mr. Pulley said the things that the defendant claimed he did, he failed to give any account of *what they did say* to the defendant to cause

her to make the confession. He does not claim to have pointed out to her any fact or facts which would indicate her guilt. The only statement he admits making to her was that she should tell the truth. Nothing was said at the time about a written confession, but next morning the two officers found the defendant alone in her office and showed her the statement the Commonwealth's Attorney had written up. They requested that she sign it. The sheriff testified, however, that they told her she didn't have to sign it unless she wanted to, and could make such changes therein as she saw fit. This she denied. Immediately after the statement was signed, the sheriff placed her under arrest and took her before a justice of the peace who admitted her to bail, with her mother as her surety. This is the statement which she signed and which was admitted in evidence:

"I, Louise H. Macon, hereby state that on the night of October 4th, (Friday), 1946, at about 11:40 o'clock, I shot and killed Andrew C. Thomas. The circumstances surrounding this shooting were as follows:

"He had been coming to see me ever since about 1942 and had been staying at the home of my widowed mother and myself. We had been having illicit relations but I desired to stop this and so told him. One night in July he took me in his automobile on the Ivor-Courtland road and after parking his car took his pistol from the back seat of the car and forced me to submit to his wishes. On the night of the 4th, Oct. after we had attended church conference, he again insisted on the same relations in the dining room of my home and I refused, whereupon he choked me, but never hurt me much, although the choking was somewhat uncomfortable. When I still refused, he then went out the front door and came back shortly thereafter and had his pistol. He did not use any words threatening to shoot me but I knew what it meant as he had used the same method before. He then laid his pistol on the table which we were standing by and when I again refused, he again choked me and this time hurt, and I grabbed the gun with my left hand, (I am left-handed) and shot him. He

fell on the floor and I then straightened him out by laying him on his back and placed the pistol in his hands and went upstairs where my mother was. I told her he had choked me but I said nothing about having shot him.

"These statements were made of my own free will in the presence of the Sheriff and Commonwealth's Attorney of Southampton County, on the night of October 17th, 1946, and this writing is signed by me on the morning of the 18th of October, 1946, in the presence of the said Sheriff. I further state that the above is true and that no threats have been made against me or no inducements whatever have been offered me to cause me to make these statements. I further certify that before this, I have tried to lead the officers and people to believe that Thomas committed suicide, which I now say was false and I state that I was in fear of serious bodily harm and that I took his life in order to keep him from seriously injuring me and to prevent him from having sexual relations with me.

"This 18th day of October, 1946.

"(Signed) LOUISE H. MACON."

From the foregoing general outline of the evidence it is clear that the guilt of the defendant, from a legal standpoint, turns upon the question whether the confession itself constitutes credible evidence sufficient to sustain the verdict of the jury.

In the first place, the manner in which the confession was obtained does not lend weight to its credibility. The defendant, while in a weeping condition, was deliberately trapped into a secluded spot by the Commonwealth's Attorney and the sheriff. She was thus purposely deprived of the protection or advice of her mother or any one else which she might have desired before taking any such momentous step as making a confession of guilt. She had no advice of counsel to guide her. She had known these two officers for about twenty years, called the Commonwealth's Attorney by his first name. They appeared to her to be acting in the role of powerful friends, rescuing her from a perilous situation. Whether they intended to

create such a belief or not, it is clear that she thought that by making the statement she did she would get out of a murder charge which she thought she would otherwise be confronted with. Instead of getting her out of such a charge, however, it got her into it. We think such action as this on the part of the attorney for the Commonwealth was highly improper. While the laws of the State vest in this officer wide authority in instituting prosecutions, such authority carries with it a commensurate responsibility. It should be exercised with caution and only in cases where, after a proper investigation, he is reasonably satisfied of the guilt of the person suspected of crime. It is just as much his duty to protect his fellow citizens from unjustified prosecutions as it is to prosecute those who are guilty. The fact of an indictment or other charge of crime carries with it a stigma which cannot be erased, even if there is an acquittal at the hands of a jury. In addition to the heavy expense involved, there is also the inevitable worry, anxiety and mental anguish incident to the charge, and the uncertainty of the outcome of the trial.

The attorney for the Commonwealth in this case did not take the witness stand to justify his action in seeking the confession. There is nothing in the record to show that his suspicion of defendant's guilt was based upon or supported by any actual facts. No fingerprints were taken from the pistol or other objects. Under the circumstances as disclosed by the record, it was error to permit the confession to go before the jury.

We think, furthermore, that the evidence demonstrates that certain supposed facts contained in the written statement of defendant, upon which the confession was chiefly based, are not true.

We must conclude from the testimony in the record that the deceased either committed suicide or was shot by the defendant. It is obvious that the choking or strangling of the defendant occurred before the deceased was shot through the head, because immediately after that he was either dead or unconscious and could not harm her further.

It appears from the testimony of Dr. Babb that when he saw her, about half an hour after the shot was heard, she could not talk, but was in a daze and her mental faculties were dead; that bruises on her throat showed she had been choked with great violence, apparently by a human hand. The presence of her eyeglasses on the floor and one of the lenses under the body of deceased showed that they had been knocked off prior to his death. The violent force which the doctor stated caused the condition of her throat was certainly more serious than the casual "hurt" mentioned in the confession. She testified at the trial that she became unconscious when deceased grabbed her throat, and the truth of this is borne out by the doctor's testimony that unconsciousness will usually cause the expulsion of the contents of the bladder, and this had occurred to her. She was not in a state of insensibility after the shot was fired because immediately thereafter a next door neighbor, Mrs. Davis, heard her groaning and moaning, though she had heard no such sounds before the shot. The unconsciousness, therefore, the existence of which we think the evidence clearly establishes, necessarily occurred from the choking before the shot, and therefore she did not fire it while being choked, as the confession indicates. The defendant testified that the choking took place at eleven-thirty o'clock while the shot was heard by Mrs. Davis ten minutes later at eleven-forty. During this time defendant evidently had been unconscious, and we think the evidence shows that her sensibilities were partially restored by the sound of the shot which the doctor testified was sufficient to produce that effect.

The confession also has her stating that when the deceased's hands on her throat "hurt", she reached over with her left hand, picked up the pistol, which was lying on the table, and shot him. She was a forty-eight year old woman, engaged in clerical work; was five feet three inches in height and weighed about one hundred and ten pounds. The deceased was about fifty years of age, was six feet two inches tall, and weighed about one hundred and ninety

pounds. He was a man of powerful physique. The evidence shows that before the shot was fired the defendant's throat had been subjected by him to a pressure of great force and violence. To shoot the deceased in the manner shown by the evidence it would have been necessary for her to raise the large heavy pistol a foot above her own head, level off the barrel and pull the trigger. The latter alone requires considerable muscular strength. That she could have accomplished this feat while being violently choked, or that the deceased would have permitted her to do so under the circumstances, even if she had been able, cannot be considered as within the reasonable bounds of credibility.

The challenged confession also states that after defendant shot deceased she "straightened him out by laying him on his back and placed the pistol in his hands." The sheriff testified that she told him and Pulley that "she put his (the deceased's) finger on the trigger, but didn't know what finger it was." The pistol was found in the right hand of deceased lying across his breast or stomach and his left hand was on top of it. His right *thumb* was *through* the trigger guard pressed against the trigger. This was testified to by four witnesses, and it was the most appropriate finger for him to use to fire the shot straight through his head. The pistol is one of the exhibits now before this court. It is a very large and heavy one, being eleven and one-half inches in length. The sheriff testified that deceased had extremely long arms and big hands; also that *"he had a large thumb and it was right in there, in the trigger. It was hard to get out."* The space between the trigger in its normal position and the forward part of the guard is only one inch. This is not space enough for such a large thumb to fit into without forcing the trigger back towards the firing position. Even when it is all the way back the space is only one and one-half inches. The defendant could not have forced the large thumb of deceased in this space, as described by the sheriff and other witness, without forcing the trigger back and running the

risk of again firing the gun. Furthermore, this would have required a great deal of force. There is a spring which tends strongly to return the trigger to its normal condition while it is being pressed back toward the firing position. On the other hand, if the *deceased* was pulling the trigger back with his thumb, obviously it could have slipped into the larger opening caused thereby and been caught or wedged in it at the time of the shot. This would account for the difficulty the sheriff experienced in getting the deceased's thumb out of the trigger guard. But it would be straining beyond the bounds of our credibility to accept the Commonwealth's contention that, while in the "moaning and groaning" condition described by four witnesses, three of them for the Commonwealth, the defendant could or would have exerted sufficient force to insert the large thumb of the deceased between the trigger and the guard so as to wedge it tightly therein and make it difficult to remove as described by the sheriff. We think that, under the circumstances described, the position in which the deceased's thumb was found affords conclusive evidence that it was this thumb which pulled the trigger and fired the shot which killed the deceased.

The Commonwealth argues that the fact that the deceased was found lying on his back, stretched out, with his hands on his stomach or chest, shows that the defendant arranged his body. But this argument is based upon the assumption that the deceased was standing when he was shot. When he shot himself, as we think the evidence clearly shows, he probably was seated on the floor. The position of his left hand lying on top of his right indicated that he used both hands in adjusting the weapon to the position desired to direct the path of the bullet straight through his head. After the shot they would both fall naturally to the position in which they were found, and his body would straighten out. If defendant had arranged the body, it is not likely she would have left one leg bent with its foot propped against the table. Moreover, after

the shooting the defendant was not in a physical condition to enable her to arrange the heavy body.

In the very able brief and argument of defendant's counsel the theory is advanced that after defendant became unconscious the deceased thought she was dead, was overcome by remorse and decided to end his own life. Either that, or he was carrying out a previously conceived plan of murder and suicide. The evidence relied on in support of these viewpoints is persuasive.

A young lady who worked at the same place as deceased testified that in a conversation a short time before his death he told her he was much in love with the defendant, wanted to marry her, "and if she wouldn't have him she wouldn't live to marry anyone else." He made a similar statement to another acquaintance two days before his death. On the day before he died his foreman reprimanded him for slackness in his work, to which he replied: "You ought not to get after me that way because I have more troubles than anybody. I sometimes just feel like killing myself." "Sometimes I think I would just as soon be dead as living." A short time before his death he told a fellow employee that the defendant "was running out on him," and "it will be the last time she will run out on me," and on the day he died he told this party he would not lend him his gun, "I might need it tonight, or any time." Two days before his death he refused to sell his pistol to a would-be purchaser, saying, "No, I am liable to need that gun any time." About five o'clock of the afternoon of his death deceased told a fellow employee that he had a gun in the glove compartment of his car. He had been having family troubles, and on the day he died he had just received a letter from his daughter telling him she never wanted to see him again.

The foregoing testimony is strongly corroborative of the other evidence which has led us to the conclusion that the deceased took his own life. There is no credible evidence to the contrary. "Evidence relied on to sustain a verdict must be credible evidence. It must be evidence which one has a right to believe. It must not strain the

credulity of the court." *Malbon* v. *Davis*, 185 Va. 748, 40 S. E. (2d) 183. The only evidence tending to sustain the verdict and judgment now before us is the so-called confession of the defendant, which she has repudiated. Since we think this confession itself is based on supposed facts proven untrue and is incredible, the conviction must fall. We have repeatedly said that a verdict cannot be sustained by evidence that is contrary to human experience or is inherently incredible. *Terry* v. *Commonwealth*, 174 Va. 507, 6 S. E. (2d) 673.

Because for the reasons already stated the case will have to be reversed, we did not consider it necessary to discuss the assignment of error relating to the conduct of the attorney for the Commonwealth during the trial of the case. We agree fully, however, with what is said on this subject in the concurring opinion of Mr. Justice Buchanan. The fact that his unfairness toward the defendant appeared so obvious at the trial lends strong support to the defendant's claim of conduct of a similar unfair nature on the part of said Commonwealth's attorney in securing the confession from her.

It follows from the views herein expressed that the judgment complained of must be reversed and the case remanded for a new trial not inconsistent with the views herein expressed, if the Commonwealth should be so advised.

*Reversed and remanded.*

BUCHANAN, J., concurring.

I think this case ought to be reversed, but disagree with the reasons stated in the court's opinion.

The reasons assigned by the court for reversal are that the confession of the defendant should not have been admitted in evidence; and that after being admitted it should not have been believed.

The question of its admissibility was raised in the trial court and thoroughly inquired into. The court determined

that it was a voluntary confession, on what seems to me to be solid ground.

The defendant here was a mature woman, intelligent, experienced, and of sufficient education to serve as secretary of the church conference she and the decedent had attended on the night he died, and to do other secretarial work. She was not, and did not claim to be, the victim of third degree methods. She went voluntarily from her home to the place of confession with the sheriff and the Commonwealth's attorney, both of whom she had known for years. She did not claim that they intimidated or terrified her. She claimed she was induced to make the confession by the statement of the Commonwealth's attorney that if she would say she killed deceased because he attempted to rape her, then she could plead not guilty because she would have done it in self-defense, and if she did not, people would come from Chatham and file a first degree murder charge against her.

The sheriff testified emphatically that no such inducement was offered her; that not a rough word was said to her and no request was made of her beyond the request that she tell the truth.

After she had told them in the automobile that she had killed the deceased, they went back to the house and she there re-enacted the scene. At the conclusion of that demonstration, her mother was called in, and at the defendant's request the Commonwealth's attorney repeated what the defendant had said, and the defendant then told her mother that was the truth. Both the defendant and her mother admitted this occurrence, the only difference being that they claimed that during the Commonwealth's attorney's recital the defendant only said "Uh huh," instead of "That is the truth," as the sheriff testified. That was about ten o'clock at night. Next morning about eleven o'clock the sheriff and the Commonwealth's attorney presented to the defendant in her office the written confession quoted in the court's opinion. She was asked to read it and told if she wanted to strike out anything, or add anything, it would

be done, and if she did not want to sign it she did not have to do so. She read it over two or three times and asked, "How long will fingerprints stay on a gun after they are there?" She admitted asking that question. The Commonwealth's attorney replied he did not know, and thereupon the defendant signed the statement. She also asked, "How much time do you think I will get—ten years?" The Commonwealth's attorney told her he had no idea, and she responded that she did not care about it for herself, but did for her people. She claimed she was still under the spell of the Commonwealth's attorney's promise when she did those things. She and the sheriff both testified at length before the trial court on the question of the admissibility of the confession, and when her statement was admitted they both likewise testified at length and were vigorously cross-examined before the jury as to the details of this confession. The court was satisfied that it was a voluntary confession, and in my opinion he was justified in that conclusion.

It is immaterial that the sheriff asked the defendant to go with him in his car to the place of the confession. That was done, he testified, in order that their talk would not be interfered with by her mother. The fact that the Commonwealth's attorney afterwards joined the sheriff and the defendant in the car does not affect the voluntary character of the confession, even though the defendant was not told he would do so. This Court has expressly held that, "The fact that artifice was employed to obtain the presence of the accused at the place at which he made the confession is immaterial." *Omohundro* v. *Commonwealth*, 138 Va. 854, 121 S. E. 908.

We also said in the case last cited: "It is true that, in order to render it admissible in evidence, the burden rested upon the Commonwealth to show that the confession in question was voluntary; but the decision of that question of fact was for the trial judge, upon consideration of all of the evidence on the subject. 1 Bish. New Cr. Proc. (4th ed.) section 989. ' * * as often said, the real question in every case is whether or not the confessing mind was influenced

in a way to create doubt of the truth of the confession.' (*Idem.* section 1224.) To the same effect, see *Smith* v. *Commonwealth*, 10 Gratt. (51 Va.) 734. 'Over this sort of question, the court has a wide discretion' (1 Bish. New Cr. Proc. section 1222); and its decision by the trial judge 'is not ordinarily to be disturbed on review.' (*Idem.* section 1220)." (*Omohundro* v. *Commonwealth*, 138 Va. 854, 863, 121 S. E. 908, 910).

See also, *Johnson* v. *Commonwealth*, 184 Va. 466, 35 S. E. (2d) 770, and cases there cited.

In rejecting the confession the majority opinion has accepted as true the testimony of the defendant, who is the person most vitally interested in this case, and has rejected the testimony of the sheriff, who was known to the trial court and to the jury and who was by them believed.

The court's opinion goes further and holds that the confession, after being admitted, was not true and should not have been believed. I think that conclusion disregards the clear boundary line between the functions of the court and the jury. They, not we, are the triers of the facts. If there is credible evidence to support their finding, we ought not to upset it because our interpretation of that evidence differs from theirs.

There is nothing incredible about the defendant's solemn written statement that she shot this man. That is what she told the sheriff and the Commonwealth's attorney twice, repeated it in the presence of her mother, and put it in writing next day. It should not be lightly accepted that a woman of the maturity and intelligence of this defendant, with no more pressure than she claimed, would falsely assert that she killed a man.

The points relied on in the court's opinion to demonstrate the falsity of the defendant's confession are points that the jury had before them and rejected. The jury saw the witnesses and heard them testify. They saw and heard the defendant as she tried to take back her confession that she shot the deceased. Her explanations are weak and unconvincing, even on the printed page. The jury also heard and

saw the sheriff when he contradicted every material claim she made about it. The jury heard the evidence about the weight and height and strength of the parties. They weighed the probability of her having fired the shot under the circumstances discussed in the court's opinion. They saw the pistol that has been exhibited to us. It is not incredible that they knew as much about its structure and its use as we do. The size of the deceased's thumb and the probabilities of how it got into the trigger guard were known to them certainly as definitely as to us. It was doubtless with some confidence that they felt warranted in rejecting the idea that he selected that awkward digit to fire the pistol instead of the one naturally and universally used for that purpose. In order to overcome and to demonstrate the untruthfulness of defendant's explanation of the position of the body of deceased on the floor, the court indulges the supposition that the deceased shot himself when "he was probably seated on the floor."

After the trial court and the jury had heard all the testimony about how the confession was obtained, the jury were told by instruction F, on motion of the Commonwealth, that they should consider the whole of defendant's admissions, as well those in her favor as those against her, unless the circumstances attending them discredited them, in whole or in part, and that they might believe or disbelieve her statements, in whole or in part, as reason decided.

The sheriff, who contradicted specifically the defendant's claim of unfair advantage, had held his office for 21 years. If he and the Commonwealth's attorney were the type of men who would set about to convict the defendant by unfair means and false testimony, the people of the county would have found it out before this and the jury would have known it. We should not, in my opinion, find them guilty of that conduct with nothing more than the testimony of this defendant to base it on.

Only the defendant knew how the shooting occurred. The other witness is dead. The defendant's first statement about it was that, without rhyme or reason, the deceased

suddenly choked her into insensibility and she did not know what happened after that. I do not think the Commonwealth's attorney, especially in view of the admitted relations between these parties, is subject to criticism for not accepting her version as true. He would have been remiss in his duty if he had not tried to ascertain the truth. It was his duty, of course, to go about his search honestly and fairly and with proper regard for the defendant's rights. The sheriff testified that he did so, and the court and the jury believed him.

I think his conduct of the trial, however, was fairly subject to criticism. There was a direct conflict between the sheriff and the defendant as to what happened. The Commonwealth's attorney was present on all the occasions the sheriff testified about. He became a material witness to those transactions. When that situation developed, he should have retired from the case and another should have been appointed to prosecute. Instead, by his method of questioning, he was able to impress upon the jury that he vouched for all the sheriff said, and by the same means he contradicted the defendant in his cross-examination of her. This he accomplished without being sworn as a witness and without submitting himself to cross-examination. That procedure was unfair to the defendant.

Its unfairness was emphasized and added to by the ruling of the court during the argument. Defendant's counsel began to comment on the failure of the Commonwealth's attorney to testify and to argue that his failure created a presumption that his evidence would be against the Commonwealth's contentions. On objection by the Commonwealth's attorney, the court would not allow the argument and defendant excepted. I think that ruling of the court was prejudicial error, and for it the case should be reversed and remanded for a new trial.

I am authorized to state that Chief Justice Hudgins and Justice Spratley fully concur in the views expressed herein.