113 S.E.2d 842 (1960)
201 Va. 842
Sharon Emanuel DURRETTE
v.
COMMONWEALTH of Virginia.
Supreme Court of Appeals of Virginia.
April 25, 1960.
*843 E. C. Wingfield, Charlottesville, for plaintiff in error.
Thomas M. Miller, Asst. Atty. Gen. (A. S. Harrison, Jr., Atty. Gen, on brief), for defendant in error.
Before EGGLESTON, C. J., and SPRATLEY, BUCHANAN, WHITTLE, SNEAD and I'ANSON, JJ.
BUCHANAN, Justice.
A grand jury of Nelson county on September 22, 1958, returned an indictment against the defendant, Sharon Emanuel Durrette, containing two counts, one charging him with attempting to rape Mrs. Annie Henderson Ferguson, and the other with maliciously wounding her. On his trial to a jury he was found guilty of the charge of attempted rape and sentenced to twenty-seven years in the penitentiary, the punishment ascertained by the jury. We granted him a writ of error to determine his contentions that he was deprived of his constitutional rights; that improper evidence was admitted; that the evidence was not sufficient to support the verdict, and that certain instructions were improperly given and others improperly refused.
The evidence for the Commonwealth was sufficient to establish the following facts:
Mrs. Ferguson, 29 years old, lived with her husband and small daughter in their home near Hebron church in a rural section on Route 151 in Nelson county, and close by the home of her mother and stepfather, Mr. and Mrs. Henderson. On the morning of August 7, 1958, the date of the alleged crime, Mrs. Ferguson's husband left their home a few minutes after seven o'clock to go to his work some distance away. About ten minutes later Mrs. Ferguson went to a well beyond her mother's home to get a bucket of water. On her way back to her own home she stopped momentarily to speak to her mother and saw the defendant, whom she referred to as "this teenager" going through the yard on the far side of her house, walking fast around toward her back door. She hurried *844 over because her little girl was in bed asleep. As she approached she looked through a window and saw the defendant on the enclosed back porch. She pushed open the screen door, still holding the bucket of water, and the defendant was standing on the mat at the door into the kitchen. He said good morning and asked if she had any eggs to sell. She said she did not but perhaps her mother did. The defendant looked at her for a few seconds, then walked toward her and struck her on the head with a rock held in his hand. She fell to her knees, her arm went into the water bucket and she suffered abrasions to her arm and also to her knee. She was dizzy for a few seconds and as she recovered she thought that possibly he wanted to rob her so she said to him, "I don't have any money." He made no reply, just looked at her, then grabbed her arm with both of his hands, raised her up and pulled her two or three feet toward the kitchen door. She screamed at least twice and the defendant ran out, going back around the house as he had come and into the bushes on the hill in front of the house. He was then going in the direction of his own home, which was some distance east of the Ferguson home and back on the hill on the opposite side of the road.
When the defendant grabbed her arm and started pulling her she tried to fight him but said she could not do anything with a young boy. Her head was bleeding and blood was running down on her blouse. It was then about 7:30 a. m.
A doctor examined her later that morning and testified that she had an abrasion on the left temple region of the scalp about 1½ inches long which would have caused immediate bleeding, in addition to abrasions on her elbow and knee. The head wound was such as would be made by the rock which was in evidence, and which was later found on the porch with some hairs on it.
Mrs. Ferguson did not know the defendant at that time but gave the officers a description of him and readily identified him after his arrest and also in the courtroom. Her stepfather testified that he knew him and saw and recognized him that morning as he passed in front of the Henderson home going up the road about ten minutes before he heard Mrs. Ferguson scream. On hearing her he went to her house and immediately called the police. Mrs. Henderson testified that she had known the defendant ever since he was a little boy and that she also saw him as he passed the house. She heard her daughter "holler" and ran to her and found her standing on the porch with blood running down from her head. She then saw the defendant on the opposite side of the road in the brush, running humped over and going toward the trees on the hill and in the direction of his home.
The defendant was found about 11:30 of the morning of the incident by Sgt. Gaunce, of the State police, at the home of Kee Jackson, for whom he worked. The officer recognized him from the description given by Mrs. Ferguson. He asked the defendant to get into his car and told him they were going down to Hebron church. The defendant got in and rode to that point without making any comment. When they arrived, Mrs. Ferguson came to the car and identified the defendant, who said he had not gone to the Ferguson house and that he was not the person. He was placed under arrest and taken to the courthouse by Deputy Sheriff Dixon and Deputy Sheriff Whitehead. Later that afternoon he signed a statement confessing his guilt which was introduced in evidence.
In his statement he said that he left home about eight o'clock that morning and went to the Union church (on the road not far from the Ferguson home), where he expected his employer to pick him up. After waiting about ten minutes he decided to go on up to the Hebron church. There *845 he decided to go up to Mrs. Ferguson's. He knew, he said, that Mr. Ferguson worked in the daytime and was not at home, and he decided to try to have sexual relations (he used a short word for it) with Mrs. Ferguson "but did not plan to knock her in the head at first." His statement continued:
"When I got outside of the house I picked up a rock. I was just going to hit her on the head a little bit. I knocked at the screen door and didn't no one answer. Then I went to the main door and knocked but nobody come. After a while she come on in. I told her that I wanted a dozen eggs. She didn't say nothing but that she didn't have none.
"She held the screen door open. When she did I hit her with the rock. The rock was in my right hand. She fell down on the porch on the bucket of water. I caught her by the hand and tried to pull her into the kitchen. She hollered three or four times.
"I took and ran out the door and across the road near where I come in at. I took and jumped across the bank and went on up into the field. Then I took and came back through the field back to the Union Baptist Church. I had just got back there when McKee Jackson picked me up."
On his trial the defendant repudiated his confession, claiming that he signed it under duress, and testified that he did not go to the Ferguson home but stayed at the Union church until Kee Jackson picked him up that morning; that they then drove to a store where Jackson bought something for his truck and then went back to Jackson's house. The defendant introduced five witnesses who testified to seeing the defendant at the Union church at times of the morning stated to be 7:15, 7:20 and 7:35. Another witness testified that she saw him at Kee Jackson's house that morning, looked at a clock and it was ten minutes until eight. The others said they had looked at a watch or watches at the times stated by them.
Jackson, called by the Commonwealth, testified that he was about thirty minutes late that morning and picked defendant up at the church between 7:30 and 7:45.
Very clearly the evidence was ample to sustain the verdict of the jury. See Ingram v. Commonwealth, 192 Va. 794, 66 S.E.2d 846, and cases there cited.
The defendant contends, however, that his constitutional rights were violated in that the law with respect to the arrest and detention of juveniles (Code, 1958 Cum.Supp., Title 16, Chapter 8, Article 4, Sections 16.1-194 ff.), was not complied with.
The defendant, a Negro youth, was 15 years old at the time of the alleged offense, August 7, 1958. He became 16 on August 24, seventeen days later. A child is defined as a person less than eighteen years of age, § 16.1-141(3). In substance, as applicable to the present case, these sections provide:
No child may be taken into immediate custody except when the officer, under the circumstances, considers it necessary for the child's welfare, or when there is good cause to believe that the child has committed a felony, § 16.1-194; that no warrant of arrest shall be issued for a child between fourteen and eighteen except when its use is imperative, § 16.1-195; that no child shall be transported in a police patrol wagon, or confined in jail, except if over fourteen he may, with the consent of the juvenile judge, clerk or probation officer, be placed in jail or other place of detention for adults in a room or ward entirely separate from adults.
Section 16.1-197 provides that whenever an officer takes a child into custody, "depending upon the circumstances existing at the time," he "shall use the following procedure or such appropriate parts thereof:" followed by a number of alternatives, including the provision that if the child is over fourteen, if the officer taking custody deems it to be for the best interest of *846 the child or of the public, he may, after obtaining a warrant from a person authorized to issue criminal warrants, take the child "to the special place of detention for juveniles or to a separate cell of the jail apart from criminals or vicious or dissolute persons." Immediately, or as soon thereafter as reasonably practicable, the custodial officer, or other officer at his direction, shall notify the judge of the juvenile court, its clerk or probation officer, and request the issuance of a proper process and order of commitment, and thereafter as soon as practicable notify a parent or other person having custody of the child.
The evidence discloses that the two sheriff's deputies to whom the defendant was delivered by Sgt. Gaunce at Hebron church about noon brought him to the courthouse. The Sergeant went then to see the defendant's mother and talk to her about the matter. The defendant rode to the courthouse in Deputy Sheriff Dixon's automobile, followed by Deputy Sheriff Whitehead in his car. There they took him into the sheriff's office. The county court was then in session, the judge of which was also the juvenile judge. A crowd of people was in and about the courthouse. Dixon was instructed, he said, to take the defendant to the State police office, which was across the street from the courthouse in another building. Seven or eight officers were there and all went to lunch except Dixon and Whitehead, who were left in charge of the defendant and they put him in jail for safekeeping, they said, until after lunch. Coming out of the jail they met State Trooper Hart, told him that the defendant had admitted the crime and Hart said he would swear out a warrant for him. This was done that afternoon before a justice of the peace.
After lunch Trooper Hart, Dixon and Whitehead went to the jail and found there with the defendant his mother and an attorney, but the latter said he was not representing the defendant and left the jail. The jailer had told Dixon that the defendant had counsel and had been advised not to return to the scene. However, the defendant volunteered to go back to the scene and did so in an automobile with Trooper Hart and the two deputies. The officers testified that the purpose of the visit was to have Mrs. Ferguson and also Mrs. Henderson identify the defendant and to find a plank with which the defendant said he had struck Mrs. Ferguson. From there he was brought back to the jail and was in jail continuously until his trial.
A jail record introduced in evidence showed that the defendant was admitted to the jail at 1:45 p. m. on August 7, 1958, on a commitment signed by the justice of the peace who issued the arrest warrant. The jailer testified that there were no separate facilities in the jail for juveniles and the defendant was kept downstairs a short time, then moved to a separate cell upstairs where he stayed for a few days and was then treated about like the other prisoners and was not locked up all the time. At least part of the time he was in a cell with two men charged with crimes, the nature of which was not disclosed.
There was also evidence that while the defendant was in the sheriff's office after his arrest and before he was put in jail, a deputy sheriff advised the judge of the juvenile court of the defendant's arrest and inquired whether he could be put in jail, and that the judge came to the door of the sheriff's office, saw the defendant and granted permission for him to be put in jail.
On August 9, two days after defendant's arrest, Trooper Hart filed a petition before the judge of the juvenile court as provided by § 16.1-164 and § 16.1-165 of the Code. Pursuant to § 16.1-166 the court, on the same day, issued a summons to the defendant and his parents to appear for a hearing of the matter on September 5, 1958, together with a detention order requiring the serving officer to take the defendant into custody and produce him before the *847 court or commit him to jail until the hearing. The court ordered that an investigation be made, as required by § 16.1-164 "which may include the physical, mental and social conditions and personality of the child or minor and the facts and circumstances surrounding the violation of the law." A full report was accordingly made and filed by the county probation officer. A hearing was duly had by the juvenile court in the presence of the defendant, his counsel and his parents on September 5, following which the court ordered that the defendant be certified to the circuit court for proper criminal proceedings.
It appears from the report of the probation officer and otherwise in the record that the defendant was born August 24, 1942, was large for his age, 5 feet 7 inches tall and weighing 153 pounds, with borderline to dull normal intelligence. He had finished the seventh grade in school and expected to enter a training school at the next session.
While it cannot be said that the defendant's arrest and detention were in strict conformity with all the provisions of the Code sections referred to above, the deviations therefrom cannot fairly be said to have deprived the defendant of any constitutional right. As stated in § 16.1-140 thereof, the juvenile laws are to be construed liberally and as remedial, and the court shall proceed upon the theory that the welfare of the child is the paramount concern of the State. However, these laws recognize that cases arise of such serious character as to require that the child be dealt with as an adult under the general criminal laws, § 16.1-177; and the sections themselves, as indicated, leave many of the procedures to the judgment and conscience of the custodial officer.
The automobile in which the defendant was transported between the scene of the crime and the jail was not shown to be a police patrol wagon such as referred to in § 16.1-196. There was evidence also, as pointed out, that his lodgment in the jail was with the consent of the juvenile judge and permitted by said section. The record indicates that there was excitement in the community over the crime and it does not refute the claim of the officers that they acted under the existing circumstances in what they believed to be the best interest of the defendant and of the public, as authorized by § 16.1-197.
The statutes referred to are of a procedural nature and the manner of arresting, transporting and incarcerating the defendant shown by the evidence in this case did not, as stated, deprive him of any constitutional right. The facts distinguish this case from Tilton v. Commonwealth, 196 Va. 774, 85 S.E.2d 368, in which Tilton's conviction was reversed because he was denied the benefit of the investigation required by what is now § 16.1-176 (then § 16-172.42). That investigation was made in the present case.
The facts in this case bring it within the principle stated thus in McHone v. Commonwealth, 190 Va. 435, 444, 57 S.E. 2d 109, 114:
"The conviction of a defendant does not lack due process of law merely because the Commonwealth's officer has failed to perform his legal duty in dealing with him after his arrest. * * * His [the officer's] wrongful act should not deprive the Commonwealth of its right to enforce its penal laws unless it is made reasonably clear that such wrongful act has in fact invaded the defendant's constitutional rights and deprived him of evidence material to his defense which he would otherwise have obtained."
Defendant next contends that it was error to admit evidence of defendant's oral and written confessions because they were not proved to have been voluntarily made.
The written confession is referred to above. The oral confession was testified to by Deputy Sheriff Dixon and Deputy Sheriff Whitehead, and no objection was *848 made to the admission of their testimony. Dixon testified that when he and Whitehead were left with the defendant at the State police office, he told the defendant to sit down and tell him why he went to Mrs. Ferguson's home and what he went there for; that it would be a lot better on him to tell the truth. Defendant replied that they [the officers] were all a bunch of liars; that he had not been there, knew nothing about it and did not know Mrs. Ferguson. The defendant was then standing up and Dixon caught him by the arm and told him to sit down, and that "we were there to help him and that we would help him providing he was willing to be helped, and I wanted him to tell me the truth, that they had identified him through his clothing and one of the ladies by name," and that the defendant at that time "started to tell me what time he left home and where he went to, and the purpose of going to the house. I did not write any of the statement down whatsoever." Dixon did not relate to the jury what the defendant had said. He testified, however, that when they came out of the State police office they met the State troopers and informed them that the defendant "had admitted the crime." He testified further that in his statement in the police office defendant had said he had used a plank or board and had thrown it down a creek or gully; that he volunteered to go back with them and show them where it was, and that was the purpose of the trip back to the scene, but that while going over there the defendant admitted that he hit Mrs. Ferguson with a rock.
Dixon further testified that on returning from the scene they went to the State police office; that when they entered Trooper Hart asked defendant if he was ready to give a statement and he said he was, "And I told him to go ahead and tell Trooper Hart exactly what he had told me previously. And he did."
Deputy Sheriff Whitehead testified that after the defendant was taken to the State police office, he, Whitehead, stepped outside and talked to some of the other officers. When they went back into the office Dixon was questioning the defendant and the defendant was telling him that he had gone up there on the pretense of buying eggs. "He told us approximately how he did it." He said the defendant readily consented to be taken back to the scene that afternoon and while there he admitted that he hit Mrs. Ferguson with a rock.
The written statement was taken down by Trooper Hart at 5:45 p. m. Before it was introduced Hart was examined and cross-examined out of the presence of the jury in reference to it. He testified that before beginning to question the defendant he advised him he did not have to make a statement and that he had a right to have an attorney; that defendant was never threatened or promised anything at all and that during the entire time that he talked to the defendant everything was on a friendly basis; that the statement of the defendant was voluntary; that he wrote it out first in longhand and read it to the defendant and asked him if it was correct; that he then typed it and read it to the defendant again and asked him to sign it; that the defendant signed it voluntarily and of his own free will.
The defendant was then examined by his counsel. He testified that when he was in the State police office with Officers Dixon and Whitehead, he told them that he was not going to answer any questions until he got his lawyer, Mr. Whitehead, and they started beating on him then; that Dixon struck him in the presence of Officer Whitehead and a State trooper. He then changed his statement and said that only Dixon and Whitehead were present, and that they said if he did not answer their questions they were going to kill him; that Dixon hit him in the stomach and in the face with his fist; that he told the officers that he was at the Ferguson home because of these threats, and signed the paper prepared by Trooper Hart because Dixon made him do it. He was asked, *849 "Did Trooper Hart ask you any questions?" He replied, "Naw, he didn't ask me nothing." Asked whether he was afraid of Dixon, he answered, "Yeah, I was a little bit scared." He said that he signed the statement but that it was not true. He said he did not claim that Trooper Hart ever did anything to him but that Hart was present when Dixon hit him.
These officers categorically denied that any of them struck the defendant. They testified that he was treated kindly; that he went with them back to the scene in the afternoon voluntarily, and that neither force nor threats were used to obtain the statement from him. Admittedly the defendant's person showed no sign of any blows. His testimony was contradictory and unconvincing. In ruling that the written statement was admissible, the court stated that Trooper Hart was well known to the court and was an honorable man.
We said in Campbell v. Commonwealth, 194 Va. 825, 75 S.E.2d 468, that the determination of the admissibility of a confession belongs to the court and not to the jury; that it is the duty of the court before admitting a confession to determine from the evidence whether it had been freely and voluntarily made or was extorted by threat or fear; that the court had a wide discretion in the matter which would not be disturbed on review unless abused.
The circumstances of the confessions in the present case were also fully developed before the jury and at the conclusion of the evidence the court specifically instructed the jury "to disregard and reject the confessions made by the accused in this case if you believe from the evidence that such confessions were obtained by threats, force or undue influence, on the part of the officers or that the confessions were not freely made by the accused without influence of hope or fear held out by the officers."
We find no error in the admission of the written confession. The oral confession, as stated, was introduced without objection.
Over the objection of the defendant that the records of the juvenile court were the best evidence, the Commonwealth's attorney was allowed to testify that around 7:30 p. m., August 7, some of the officers advised him and the juvenile judge that the defendant had been arrested and shortly thereafter he, the Commonwealth's attorney, advised the judge that he would have to fix up and issue proper papers; that Trooper Hart brought defendant's confession to him next day, August 8, and that after he read it and investigated the law, he fixed up the petition above referred to for Trooper Hart to sign and then called Hart and told him to come by his office next morning and take the papers to the juvenile judge for signature.
This testimony added or subtracted nothing material to or from what was otherwise shown by the evidence, as referred to above. We recede not at all from the holding in Macon v. Commonwealth, 187 Va. 363, 46 S.E.2d 396, that if a Commonwealth's attorney expects to testify on a material point he should retire from the case and let another be appointed to prosecute. However, his doing so in this case, while ill-advised, resulted in no prejudice to the defendant.
Finally, the defendant says the court erred in giving Instructions 1, 2 and 3 for the Commonwealth and refusing Instructions E and F for the defendant. His objection to the numbered instructions was that there was not sufficient evidence of attempted rape to submit that charge to the jury. We hold that there was sufficient evidence of that charge and the instructions were properly given. Instructions E and F would have told the jury that if the defendant had been denied the benefits of the law relating to juveniles he should be acquitted. They were properly refused.
The instructions given fully and accurately stated the law applicable to the facts and were eminently fair to the defendant. He was vigorously defended by his own *850 counsel. The evidence clearly supported the verdict of the jury and we find no error in the case prejudicial to the defendant's rights.
The judgment appealed from is therefore affirmed.
Affirmed.